United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 26, 2004**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 10, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————

No. 03-30227

———————

KARL L. KAPPS, Individually and
as Trustee; BRIAN PETERSON;
JORGE VARGAS; DORIS KLEGA; and
HELEN FOSTER,

          Plaintiffs-Appellants,

  versus

TORCH OFFSHORE, INC.; UBS WARBURG LLC;
CIBC WORLD MARKETS CORP.; HOWARD WEIL,
a Division of Legg Mason Wood Walker,
Inc.; LYLE G. STOCKSTILL; LANA J. HINGLE
STOCKSTILL; ERIC N. SMITH; WILLIAM J.
BLACKWELL; CURTIS LEMONS; JOHN REYNOLDS;
and KEN WALLACE,

          Defendants-Appellees.

———————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————

Before GARWOOD, JONES, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

  Plaintiffs-appellants Karl L. Kapps, individually and as

Trustee, Brian K. Peterson, Jorge Vargas, Doris Klega, and Helen

Foster appeal the district court's dismissal of their complaint by its grant of the Rule 12(b)(6) motion filed by the defendants-appellees, Torch Offshore, Inc., and certain of its officers and underwriters. We affirm.

## Facts and Proceedings Below

Torch Offshore, Inc. (Torch) is a service provider that installs and maintains underwater oil and natural gas pipelines and related infrastructure on the Gulf of Mexico's Continental Shelf. Torch's customers include major energy companies and independent oil and natural gas producers.

Commencing on June 7, 2001, Torch conducted an Initial Public Offering (IPO) during which it sold 5,000,000 shares of its common stock at $16 per share, raising $80 million. The IPO was conducted pursuant to a registration statement and prospectus dated June 7, 2001 which Torch filed with the Securities and Exchange Commission (SEC).

In the prospectus, Torch disclosed the volatile nature of oil and natural gas prices, the dependence of Torch's business upon oil and natural gas prices, and the time lags between the prices and the demand for Torch's services.[1]

---

[1] Although in their original complaint, the plaintiffs alleged omissions related to oil as well as natural gas, the only allegations now before this Court relate to the price levels of and disclosures pertaining to natural gas. The specific disclosures made in the prospectus are addressed more fully in the discussion section below.

2

The prospectus asserted, truthfully, that natural gas prices had increased by approximately 133% from February 1999 through June 6, 2001.  However, during the some five and one-third months immediately preceding the June 7, 2001 IPO, natural gas prices had in fact declined approximately 60%.  That information was not included anywhere in the prospectus.  Though it did discuss the volatile nature of oil and natural gas prices, the prospectus made no mention of any particular decline in the price of natural gas.

During the two month period after the issuance of the IPO, Torch's share prices declined to below $8 per share.  On August 2, 2001, Torch issued a press release stating that during the period after the IPO, domestic natural gas and crude oil prices declined.  The press release also noted that Torch had begun to note delays in the completion of shallow water drilling projects.

On March 1, 2002, Kapps filed a putative class action suit on behalf of all persons and entities who purchased Torch common stock between June 7, 2001 and August 1, 2001.[2]  The plaintiffs alleged violations of Sections 11 and 15 of the Securities Act of 1933 (the Securities Act), 15 U.S.C. §§ 77k and 77o.  An amended complaint was filed June 12, 2002.  The plaintiffs named as

_____

[2] Plaintiffs chose August 1, 2001, as the end of the Class Period because Torch stated in its August 2, 2001 press release that it had noticed delays in the completion of some shallow water drilling projects.  Though Torch in its press release did not attribute those delays to the decrease in natural gas prices, the Plaintiffs believed that this correlation could be made.

3

defendants Torch, certain of its corporate officers, and the underwriters for the IPO.  Torch and other defendants filed motions to dismiss under Rule 12(b)(6) for failure to state a claim for which relief can be granted on August 19 and October 18, 2002.  Plaintiffs never sought any leave to further amend.

The district court granted the motions to dismiss on December 18, 2002, holding that federal securities laws do not impose a duty on issuers to disclose industry-wide trends or publicly available information.  The plaintiffs timely appealed.

**Discussion**

*1.  Standard of Review*

This court reviews the district court's dismissal of a complaint pursuant to Rule 12(b)(6) *de novo*.  *Kane Enterprises v. Macgregor (USA) Inc*., 322 F.3d 371, 374 (5th Cir. 2003).  On a motion to dismiss, this Court must construe the factual allegations in a complaint, and all reasonable inferences therefrom, in the light most favorable to the plaintiffs.  *Id.* at 374; *In re Mastercard Int'l, Inc*., 313 F.3d 257, 261 (5th Cir. 2002).  A motion to dismiss must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  *Kane Enterprises,* 322 F.3d at 374.

Furthermore, Section 11 only requires notice pleading under Fed. R. Civ. P. 8 rather than the detailed pleading mandated by

4

Fed. R. Civ. P. 9(b) or the Private Securities Litigation Reform Act (PSLRA).  *See Swierkiewicz v. Sorema, N.A.*, 122 S.Ct. 992, 998 (2002); *In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 315-16 (8th Cir.1997), *cert. denied,* 118 S.Ct. 2321 (1998).  However, mere conclusory allegations will not suffice to prevent a motion to dismiss.  *Kane* Enterprises, 322 F.3d at 374; *Mastercard Int'l, Inc.*, 313 F.3d at 261.

*2.  Appellants' arguments*

In this appeal, appellants set forth three main arguments, taking issue with disclosures that were and were not made in the prospectus.  They base their claims on violations of section 11 of the Securities Act.[3]

First, they argue that the statement in the prospectus revealing that natural gas prices "have increased by approximately 133%" between February 1999 and the day before the IPO was materially misleading because, though technically accurate, it failed to mention the fact that there had been an approximately 60% drop in the price of natural gas in the some

---

[3] Section 11 of the Securities Act provides in relevant part::
"(a) In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--
(1) every person who signed the registration statement;
. . .
(5) every underwriter with respect to such security."  15 U.S.C. § 77k.

five and one-third months immediately preceding the IPO.

Second, appellants assert that the Torch's statement in the prospectus that there had been "recent increases in natural gas prices" was not only materially misleading but also false when made in light of the above noted fact that the price of natural gas had actually decreased prior to the IPO.

Finally, the appellants claim that in any event, Torch should have mentioned the noted decrease in the price of natural gas because it was a trend that could reasonably be expected to have a material impact on Torch's operations, and therefore its disclosure was required pursuant to Item 303 of the SEC Regulation S-K; 17 C.F.R. § 229.303.

We will address each contention in turn.

A. *Prospectus statements were not materially misleading*

A portion of the prospectus states that natural gas prices "have increased by approximately 133%" between February 1999 and

June 6, 2001, the day before the IPO.[4]  Although admittedly a

---

[4] The prospectus addressed the fact that the price of natural gas was an important component in assessing the success or failure of Torch's business, stating:
> "The price levels of oil and natural gas are the primary determinants of offshore exploration and development activity.  From two year lows in February 1999 to June 6, 2001, NYMEX closing current oil contract prices have increased by approximately 126% and NYMEX closing current natural gas contract prices have increased by approximately 133%.  As oil and natural gas prices increase or remain at favorable

factually correct and true statement, appellants assert that it was materially misleading because it failed to mention the fact that there had been an approximately 60% drop in the price of natural gas in the five and one-third months immediately preceding the IPO. The amended complaint reflects that between February 1999 and December 27, 2000, the price of natural gas rose from $2 to $10 per BTU, including a sharp upward spike (from approximately $4.50 to approximately $10) during November and December 2000. Then, in what Torch characterizes as a correction, there was a sharp downward spike from December 28, 2000 through most of February 2001 (from approximately $10 to approximately $5), followed by a gradual decline to June 7, 2001, during which natural gas prices fell to approximately $4 per BTU.

We do not find the statement that the price of natural gas "increased by approximately 133%" to be materially misleading when read in the context of the prospectus as a whole.[5] The statement correctly set forth the increase in the price of

---

levels, our customers generally increase their capital budgets for additional offshore exploration and development. . . [T]he number of active jack-up drilling rigs on the Shelf has increased from a low of 76 in April 1999 to 144 in April 2001. Demand for our services on the Shelf generally follows successful drilling activities by three to 12 months." (prospectus, 2).

[5] Though it will be addressed specifically later in this opinion, the following that analysis also applies to appellants' contention it was materially misleading for the Prospectus to state that there were "recent increases in natural gas prices."

natural gas during a specified period of time.

*(1) The statement was not misleading*[6]

Appellants rely on *Lucia v. Prospect Street High Income Portfolio, Inc.*, 36 F.3d 170 (1st Cir. 1994), to establish that it was materially misleading for the Prospectus to omit the fact that natural gas prices had decreased in the some five and a third months preceding the IPO. *Lucia* concerned a public offering of shares in a mutual fund that invested in corporate "junk bonds." The prospectus in *Lucia* truthfully stated that the average yields of certain junk bonds over the ten year period preceding the mutual fund offering were higher than the yields of U.S. Treasury bonds during that same ten year period. 36 F.3d at 172-73.

The plaintiffs in *Lucia* asserted that although those statements in the prospectus were true, they were misleading to a

---

[6] In *Oxford Asset Management Ltd. v.* Jaharis, 297 F.3d 1182, 1190 (11th Cir. 2002), the court held that there was no duty to disclose in the prospectus all information material to the offering, but only that material information necessary to make the statements in the prospectus not misleading and that material information specifically required by the securities laws to be included. The court also approved the statement in *Shaw v. Digital Equipment*, 82 F.3d 1194, 1202 (1st Cir. 1996) that the "mere possession of material nonpublic information does not create a duty to disclose." *See also Zucker v. Quasha*, 891 F.Supp. 1010, 1014 (DNJ 1995), *aff'd*, 82 F.3d 408 (Table) (3d Cir. 1996). "To avoid committing misrepresentation, a defendant is not required to disclose all known information, but only information that is 'necessary to make other statements not misleading.' [*Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 640 (3d Cir.1989)]".

reasonable investor, because the prospectus failed to disclose that during the six years immediately preceding the offering, the yield of the junk bonds had in fact been lower than the yield of Treasury bonds. *Id.* at 173. The First Circuit reversed the district court's conclusion that the representations were not misleading because they were literally true, and held that a determination of whether the prospectus statements were misleading due to failure to disclose the rates in the six year time period was a factual question, and therefore inappropriate for resolution on a motion to dismiss. The court stated:

> "the six years at issue are the six years leading up to the fund's public offering. Moreover, while any one or two years might favor Treasury securities without amounting to an unfavorable trend, we think that a six-year comparison favoring Treasury securities is substantial enough to cast some doubt on the reliability of the reported ten-year figure. . . . [W]e cannot say as a matter of law that the undisclosed information about the six-year period would not alter the total mix of facts available to the investor." *Id.* at 176.

Here, the appellants claim that stating there was a 133% increase when in reality the price had declined 60% in the months preceding the Prospectus was misleading for the same reasons set forth by the *Lucia* court. However, the First Circuit specifically stated that their decision might have been different had they only been dealing with a one or two year time period. In that case, the Treasury bonds were better during a six year period, and specifically, they were better during six of the ten years that were referenced in the prospectus. This means that

9

during 60% of the time at issue, the Treasury bonds in fact performed better than the junk bonds.  Therefore, the court found the omission of that fact to be a question for the jury to consider.

In the case *sub judice*, not only are we dealing with a significantly shorter time period (five and one-third (5.33) of twenty-seven and one half (27.5) months as compared to six (6) of ten (10) years), but we are also dealing with a much smaller percentage of the total time (nearly twenty (20) percent, as opposed to sixty (60) percent).[7]  Moreover, approximately three-fourths of the 60% drop in price occurred during January and February 2001, just  after the initial rapid increase in November and December 2000.  Thus, from November 2000 through February 2001 there was a brief sharp spike up immediately followed by a brief sharp spike down.  Nothing in the prospectus indicated that the 133% rise in price was steady (or unsteady), and during the entire period referenced in the challenged prospectus statement the price never fell to its February 1999 level.  In fact, as the

---

[7] Based on the graph included in the amended complaint showing the high and low prices of natural gas, the statement in the prospectus was accurate.  Appellants do not contend otherwise.  The entire time period at issue ranges from February 26, 1999 to June 7, 2001, a period of twenty seven and one half (27.5) months.  The period of natural gas price decrease was five and one-third (5.33) months, ranging from a high on December 27, 2000, to the June 7, 2001 ending price.  Five and one-third months is 19.38% of 27.5 months, meaning that the period of decrease occurred during nearly 20% of the entire described time.

10

prospectus states, the then current price was more than twice what it had been in February 1999.

The time period at issue in *Lucia* was nearly twelve times as long as the one here, and the undisclosed Treasury bond advantage occurred during more than half of the time discussed. Therefore, *Lucia,* with which we have no disagreement, does not support appellants. Moreover, the *Lucia* court specifically held only that there was a jury question, and that the "unfavorable six-year figure . . . [did] not *necessarily* render the ten-year comparison misleading." *Id*. at 176.

(2) *The public domain and the Section 11 element of materiality*

It appears that the district court granted the motions to dismiss on the ground that the price of natural gas is publicly available information, and therefore, the defendants could not have been in violation of Section 11.[8] If this is the interpretation intended by the district court, it is incorrect. Specifically, we hold that the definition of "material" under Section 11 is not strictly limited to information that is firm-

_____

[8] In its Order and Reasons, the district court stated, "Federal securities laws do not impose a duty on issuers to disclose industry-wide trends or publicly available information. . . . Information concerning publicly traded commodities such as natural gas . . . are readily available in the public domain, and therefore, omission of such information is not actionable under § 11. *Weilgos* [*v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989)] ('Issuers of securities must reveal firm-specific information . . .')."

11

specific and non-public.  While all material information need not
be included in the registration statement, an issuer is not free
to make material misrepresentations, or to omit material
information that is either required to be disclosed by law or
that is necessary to disclose in order to prevent statements made
in the registration statement from being misleading.

A *fact* is material "if there is a substantial likelihood
that a reasonable shareholder would consider it important" in
making an investment decision.  *Basic Inc. v. Levinson*, 108 S.Ct.
978, 983, 985 (1988), *quoting TSC Industries, Inc. v. Northway*,
96 S.Ct. 2126, 2132 (1976).  For an *omission* to be material,
"there must be a *substantial* likelihood that the disclosure of
the omitted fact would have been viewed by the *reasonable*
*investor* as having *significantly* altered the 'total mix' of
information made available."  *Id*. at 983 (emphasis added).  This
Court must determine whether "the information allegedly omitted
or misrepresented in the prospectus was material, in the sense
that it would have altered the way a reasonable investor would
have perceived the total mix of information available in the
prospectus as a whole."  *Krim v. BancTexas Group, Inc.*, 989 F.2d
1435, 1445 (5th Cir. 1993) (holding that certain omitted
information was not material, but based on the ground that the
substance of the information was adequately set forth in the
prospectus, not simply because the information was not firm-

12

specific or was publicly available).  *But see Ward v. Succession of Freeman*, 854 F.2d 780, 792-93 (5th Cir. 1988).[9]

In addition to the fact that natural gas prices were in the readily available public domain, Torch made cautionary statements regarding the volatility of gas prices.  The prospectus specifically emphasized the volatility of oil and natural gas prices and the risks posed thereby.[10]  *See Olkey v. Hyperion 1999*

[9] The court in *Ward* held that specific omissions were not materially misleading because the information was in the public domain.  However, its reasoning in coming to that determination is somewhat unclear.  In its opinion, the *Ward* court cited *Johnson v. Wiggs*, 443 F.2d 803 (5th Cir. 1971), an insider trading case, in which one of the elements of the plaintiff's claim is that the defendant bought or sold securities while in possession of non-public information.  Therefore, though it is established that information that is publicly known cannot be the basis of an insider trading violation, *Johnson* does not decide whether the failure to disclose publicly available information may still be the basis for another claim under securities law.  The Eighth Circuit has cited *Ward* for the proposition that "because passage of a statute is 'as a matter of law in the public domain,' there is no duty of disclosure." *Sailors v. Northern States Power Co.*, 4 F.3d 610, 613 (8th Cir. 1993).

[10] In its opening "Prospectus summary" section under the heading "Risk factors," the prospectus stated, "You should review and consider carefully the matters set forth under the caption 'Risk factors,' as well as the other information set forth in this prospectus, including that *our results will be affected by the volatile nature of oil and gas prices* . . ." (Prospectus, 3, emphasis added).
Later, in the more detailed portion of the prospectus, under the heading "Risk factors" there appears an introductory statement that:
    "You should consider carefully the following risk
    factors and all other information in this prospectus
    before you decide to purchase our common stock.
    Investing in our common stock is speculative and
    involves significant risk.  Any of the following risks
    could impair our business, financial condition and

*Term Trust, Inc*., 98 F.3d 2, 5-6 (2d Cir. 1996) (because

assurances in prospectus were balanced by cautionary language

which warned investors of the risk that the plaintiffs claim was

not disclosed, a reasonable investor would not have been

materially misled, and statements were not misleading); *Klein v.*

*General Nutrition Cos.*, 186 F.3d 338, 342 (3d Cir. 1999) (holding

that certain omitted information was not material, observing that

a "determination of '*materiality*' *takes into account*

considerations as to the certainty of the information, *its*

*availability in the public domain*, and the need for the

information in light of cautionary statements being made. *See*

---

operating results, could cause the trading price of our
common stock to decline and could result in a partial
or total loss of your investment."
Then there follows a serial listing and accompanying discussion
of numerous different specific categories of "risks related to
our business and operations."  The very first of these states as
follows:
"Demand for our services is greatly influenced by oil
and *natural gas prices*.  Because of *the volatility of*
*these prices*, demand for our services may vary
significantly. . . .  Oil and *natural gas prices* and
the level of offshore drilling and exploration activity
*have varied substantially in recent years*, resulting in
significant fluctuations in demand for our services.
Significant downturns in the oil and natural gas
industry in the past have adversely impacted our
financial performance, resulting in operating losses.
A significant or prolonged reduction in oil or natural
gas prices in the future would likely depress offshore
drilling and development activity.  A substantial
reduction in such activity would reduce demand for our
services and have a material adverse effect on our
financial condition and results of operations."
(Prospectus, 8; emphasis added).

14

*Trump*, 7 F.3d at 371-72, 377") (emphasis added).[11]

In *Wielgos v. Commonwealth Edison, Co.*, 892 F.2d 509 (7th Cir. 1989), the court stated, "Issuers of securities must reveal firm-specific information. Investors combine this with public information to derive estimates about the securities' value. It is pointless and costly to compel firms to reprint information already in the public domain." *Id.* at 517. Contrary to the way the district court may have understood that passage, we conclude that the *Wielgos* court likely did not mean for it to be taken as a strict rule that securities laws *never* require disclosure of any information that is not firm-specific or that is publicly available. For example, as we will discuss in more detail below, the SEC requires an issuer to disclose certain "trends" that could affect its business, and in appropriate circumstances this

---

[11] The Third Circuit in *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993), based its decision more on cautionary statements than public domain, stating, "[t]he application of bespeaks caution depends on the specific text of the offering document or other communication at issue, i.e., courts must assess the communication on a case-by-case basis . . . . Nevertheless, we can state as a general matter that, when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law." 7 F.3d at 371. *See also Olkey,* 98 F.3d at 5-6. *Trump* does partially base its decision on public domain type considerations. 7 F.3d at 377.

15

requirement may extend to certain trends that are not firm-specific or are publicly available. Moreover, the court in *Wielgos* stated that it was not addressing the question of whether omitted facts were material, but was rather ruling on whether the disclosures complied with SEC rules.

The appellants emphasize that the case *sub judice* deals with Section 11, not section 10(b)(5) which places a burden on the plaintiffs to show scienter. While it is true that scienter is not required here, many cases say that "materiality," as it is used in Section 11, in effect means the same thing as it does in section 10(b). *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873-74 (5th Cir. 2003) (holding that plaintiffs' claims under Section 11 fail because none of the challenged representations were material, and "[e]ven though the district court did not explicitly consider the materiality issue with respect to § 11, its analysis would be identical" to that under section 10b-5); *see also In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.10 (3d Cir. 1993) ("Because our analysis here is predicated on the materiality requirement, which is common to [plaintiffs' section 10(b), 11 and 12(2) claims], we do not here distinguish between [those provisions.]"); *Klein*, 186 F.3d at 344.[12]

---

[12] We note that this case deals not only with plaintiffs who purchased stock during the IPO, but also with those who bought on the aftermarket. Under *Rosenzweig* all of these plaintiffs are covered by Section 11. 332 F.3d at 872 ("We agree with plaintiffs that § 11 applies to aftermarket purchasers").

16

Appellants claim that materiality should be a question of fact for the jury, but many Section 11 cases have been properly dismissed on the pleadings for lack of materiality. *See, e.g., Rosenzweig*, 332 F.3d at 854; *Klein*, 186 F.3d at 338; *Trump*, 7 F.3d at 369 n.13 ("Although materiality is a mixed question of law and fact which the trier of fact ordinarily decides, *see TSC*, 426 U.S. at 450 . . . 'if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [it is] appropriate for the district court to rule that the allegations are inactionable as a matter of law.'") (internal citations omitted); *Krim*, 989 F.2d at 1446.

Though in a section 10 case, the Fifth Circuit has defined materiality as a "'*substantial* likelihood' that a *reasonable* investor would consider . . . [the challenged] statements . . . to have '*significantly* altered the "*total mix*" of information.'" [citing *Basic*, 108 S.Ct. at 983]. *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 422 (5th Cir. 2001) (emphasis added). The "total mix" of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders. *United Paperworkers Intern. Union v. International Paper Co.*, 985 F.2d 1190, 1199 (2d

Cir. 1993).

Natural gas prices are listed in daily papers.[13]  The Wall Street Journal, for example, compares the day's price with the price one year ago (and historic daily prices are also available through other sources, such as the New York Mercantile Exchange, or NYMEX).  While not of itself necessarily dispositive, such common public ready availability must be considered in determining whether the "total mix" of information was altered because the price decline was not included in the prospectus. When viewed in context, and taking into consideration the cautionary language used in relation to the volatility of natural gas prices and the ready public availability of natural gas prices, neither of the statements at issue were materially misleading.  It was not materially misleading for the prospectus to state that over the specified period the price had increased by 133%, or, in the particular context where the language appears, that there had been "recent increases in the price of natural gas,"[14] not simply because the omitted information was not firm-specific or was publicly available, but because there is no substantial likelihood that including the fact that the price of natural gas had declined since December 27, 2000 would have

---

[13]For example, the Wall Street Journal, the Dallas Morning News, the Houston Chronicle and the Austin-American Statesman.

[14]Appellants' argument concerning the quoted "recent increase" language  will be further addressed in the following section.

18

significantly altered a reasonable investor's perception of the "total mix of information available in the prospectus as a whole." *Krim*, 989 F.2d at 1445.

*(B) "Recent increases in the price of natural gas" and falsity*

Appellants assert that the Torch's statement in the Prospectus that there had been "recent increases in natural gas prices" was not only materially misleading but also false when made in light of the fact that the price of natural gas had actually decreased since December 2000.

The section of the prospectus at issue stated, "[d]omestic natural gas supply and production capacity have declined due to the depletion of reservoirs and the reduction in drilling activity during the *recent period* of low oil and natural gas prices in *1998 and 1999*, leading to a limited supply of natural gas. This imbalance between supply and demand has led to *recent increases* in natural gas prices." (emphasis added).[15] When read in context, the prospectus clearly sets forth a temporal

---

[15] In that same section of the Management's discussion and analysis of financial condition and results of operations (MD&A), the prospectus continued, "If higher natural gas price and volume demands are sustained, we expect significant drilling activity to continue on the Shelf, where, according to the Minerals Management Service, over 70% of the hydrocarbons produced since 1990 have been natural gas. As a result of the current environment, the number of active jack-up drilling rigs on the Shelf has increased from a low of 76 in April 1999 to 144 in April 2001 according to Offshore Data Services." (Prospectus, 38).

reference, using the word "recent" to describe prices prevailing and resultant events taking place in 1998 and 1999. Therefore, one may not reasonably conclude that it was false for the June 2001 prospectus, in the very next sentence of the same paragraph, to use the word "recent" to characterize the price increase in the previous some two and one-fourth years.

Accordingly, in light of the immediately preceding sentence of the same paragraph that also uses "recent" in reference to natural gas prices, and taking into consideration the public nature of the price of natural gas, and the fact that the decrease prior to the IPO only occurred during 20% of the total time period at issue, we hold that the challenged statement was neither false nor materially misleading.

*(C) Trends and Item 303*

Appellants assert that, regardless of whether the statements in the prospectus were misleading, Torch should have mentioned the post December 2000 decrease in the price of natural gas in its prospectus because it was a trend that could reasonably be expected to have a material impact on Torch's operations, and was therefore a disclosure required pursuant to Item 303 of the SEC Regulation S-K.

Section 11 of the 1933 Securities Act is violated if the prospectus "omitted to state a material fact required to be stated therein." 15 U.S.C. § 77k(a). Item 303(a)(3)(ii) of SEC

20

Regulation S-K requires a public offering prospectus to disclose

> "any known trends or uncertainties that have had or that
> the registrant reasonably expects will have a material
> favorable or unfavorable impact on net sales or revenue
> or income from continuing operations.  If the registrant
> knows of events that will cause a material change in the
> relationship between costs and revenues (such as known
> future increases in costs of labor or materials or price
> increases or inventory adjustments), the change in the
> relationship shall be disclosed." 17 C.F.R. §
> 229.303(a)(3)(ii).

The court in *Oxford Asset Management, Ltd. v. Jaharis*, 297 F.3d 1182, 1191 (11th Cir. 2002), interpreted this regulation, stating "[a]s regards trends, we interpret this element to require an assessment of whether an observed pattern accurately reflects persistent conditions of the particular registrant's business environment. . . . We interpret this language as establishing a negligence standard."  The *Oxford* court continued,

> "'[t]he discussion and analysis shall focus specifically
> on material events and uncertainties known to management
> that would cause reported financial information not to be
> necessarily indicative of future operating results or of
> future financial condition.  This would include
> descriptions and amounts of (A) matters that would have
> an impact on future operations and have not had an impact
> in the past, and (B) matters that have had an impact on
> reported operations and are not expected to have an
> impact upon future operations.'   Item 303(a)(3)(ii)
> essentially says to a registrant: If there has been an
> important change in your company's business or
> environment that significantly or materially decreases
> the predictive value of your reported results, explain
> this change in the prospectus." *Id*. at 1191-92.[16]

---

[16] In its amicus brief, the SEC states that the relevant provision of Item 303 is not limited to disclosures of trends that are firm-specific or that are not available to the public. Furthermore, it asserts that its interpretation in an amicus

21

We must address whether the 60% decrease in the price of natural gas during the months before the prospectus was issued was indeed a trend disclosure of which was required by Item 303. Although the drop continued for five and one-third months before the issuance of the June 7 prospectus, we again note that there was a precipitous drop in the two months immediately following a two month sharp increase; the price dropped the most rapidly in January and February 2001, after which it only gradually declined.

The prospectus was issued on June 7, 2001, and included the first quarter unaudited returns.[17]  We assume that Torch correctly reported first quarter returns, as the appellants alleged no misstatements or misleading information as to those numbers.  Although it is unclear why, in their response to the

_____

brief of one of its own regulations, such as what "trend" means in Item 303, is controlling unless plainly erroneous or inconsistent with the regulation.  *Auer v. Robbins*, 519 U.S. 452, 461-63 (1997).

We note that although the SEC disagrees with the expressions in the district court's opinion indicative of a categorical rule that matters in the public domain or which are not firm specific never need be included in a prospectus, it does not take the position that the ready availability of non firm specific public domain information (or cautionary statements in a prospectus) is categorically irrelevant to determining whether information must be disclosed in the prospectus or to the particular complaints presented by appellants respecting the June 2001 prospectus. And, the SEC makes plain that it takes no position as to whether the instant prospectus violates section 11 in any of the respects claimed by appellants.

[17] The first quarter ran from January 1, 2001, through March 31, 2001.

motion to dismiss below, the appellants included Torch's form 10-Q, filed with the SEC, for the quarter that ended June 30, 2002. This form gives the comparable quarter of the previous year. We know from the prospectus that revenues were $14.49 million for the first quarter of 2001, and from the 10-Q that they were $14.3 million for the second quarter of 2001. Accordingly, at the time of the IPO, it was not unreasonable to consider the decline in natural gas prices as not yet constituting a trend, having not significantly impacted Torch's gross revenue.[18]

However, we must then consider the appellants' "lag time" argument. Before Torch's services are required, Torch's customers generally first set up capital budgets which tend to increase after the price of natural gas and oil increases. They then conduct exploration drilling, and , if successful, they start preparation for production activities. Only then do they hire Torch to lay the pipe and carry the product to shore. Therefore, Torch acknowledges that demand for their services does not occur at the precise time drilling begins, or is delayed. This "lag time" was revealed in the prospectus.[19] Because the

---

[18] We are concerned with gross revenues here because they are the product of drilling activity. There is no allegation that any of these figures reflected in the referenced 10-Q are incorrect.

[19] As the prospectus explained, there is a "lag time" between the changes in the price of oil and natural gas, and changes in offshore exploration and development activities, and there is also a lag between the exploration and early development

23

downward spike in the price of natural gas did not immediately affect Torch's revenues, Torch's management viewed it as an anomaly, believing instead that the long term fluctuations, increases, and decreases would dictate demand for Torch's services.

On August 2, 2001, Torch issued a press release stating that during the period after the IPO, domestic natural gas and crude oil prices declined. The press release also recited that Torch had begun to note delays in the completion of shallow water drilling projects "[l]ate in the second quarter."[20] In their complaint, appellants alleged that because Torch knew, during a period of time before the IPO, that completion of some shallow drilling projects had been delayed, and in turn that these delays could have an impact on demand for their services, therefore the price decrease, which appellants allege led to the delays, was an "event[] that will cause a material change in the relationship between costs and revenues," and accordingly should have been revealed as a "trend."[21] 17 C.F.R. § 229.303(a)(3)(ii).

_____

activities and the demand for Torch's services. Therefore, Torch does not respond to short-term price fluctuations.

[20]As the second quarter ended June 30, 2001, Torch may have known about some of these completion delays before they issued the prospectus.

[21]Although the press release noted that there were delays in completion of drilling projects, Torch claims it was not a "corrective disclosure," because it had no impact on their stock price. Moreover, the press release does not correlate the

In *Oxford*, the court said, "[t]he obvious focus [of Item 303(a)(3)(ii)] is on preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects." 297 F.3d at 1192. The court went on to state,

> "[t]he prospectus stated that [the company] had lost almost $80 million since its inception and that there could be no assurance that the company would ever be profitable. If booming [sales of a particular drug] had carried [the company] for the previous several reported quarters but suddenly and significantly declined, a potential investor could be mislead by those reported results unless [the company] disclosed the importance of [that drug] and discussed the downward trend in [its] sales. That is the type of situation Item 303(a)(3)(ii) was designed to address."[22] *Id*.

Essentially, the company would be at fault for being negligent in failing to discuss that sort of information. However, we conclude that the appellants here have not alleged enough to meet such a requirement.

In the August 2, 2001 press release, Torch announced that revenues for the second quarter of 2001 were $14.3 million, up from $11.0 million for the year-ago quarter, a matter appellants do not dispute. However, the appellants allege that the press release also lends them support. The press release reveals that

_____

decrease in natural gas prices and the delays in completion.

[22] The court continued, "[b]ut that is not this case. Because the prescription information did not render [the company's] reported results any materially less indicative of the company's future prospects, Item 303(a)(3)(ii) does not require its disclosure." *Id*. at 1192.

25

> "[f]ollowing the Company's IPO, domestic natural gas and crude oil prices experienced a decline. This created caution throughout the Industry with a resultant dampening of market growth. Late in the second quarter the Company started to note delays in the completion of shallow water drilling projects. However, there are more jack-up drilling rigs operating than was the case during the last market peak . . . . The Company believes that these working rigs are simply taking longer to complete individual wells, partially a result of drilling deeper at each new well location."

It appears that Torch attributes the "dampening of market growth" and delays not only to decreased prices, as the appellants would have us believe, but also to the deeper well depths. Appellants allege nothing to suggest the incorrectness, much less the impropriety, of such attribution.[23]

Appellants also discuss the contents of Torch's January 22, 2001 draft prospectus (filed with the SEC but later withdrawn and never issued). They note that that draft prospectus included the following statement: "significant or prolonged reduction in oil and natural gas prices would likely depress offshore drilling and development activity." Appellants suggest that this statement in the draft prospectus reflects that Torch anticipated that decreases in natural gas prices preceding the IPO would have a material adverse impact on their revenue within the meaning of Item 303. However, the statement is also included in the here

---

[23]We also note that appellants do not allege any incorrectness in the August 2 press release statement that more jack-up rigs were then operating than during the last market peak. We further observe that the August 2 press release refers to a decline in domestic natural gas *and* crude oil prices, and does not state what portion (if any) of the completion delays related to gas wells.

challenged prospectus, giving warning that Torch's revenue would be impacted by a decline in natural gas prices. It was not a predictive statement, but rather a cautionary one.

Finally, appellants note that the January 22, 2001 draft prospectus indicated that it would include a graph reflecting NYMEX closing natural gas prices "from approximately 1/1/97 through approximately 1/11/01." They argue that had a similar graph, extending to June 2001, been included in the June 7, 2001 prospectus it would have reflected the decline in prices between December 27 and early June 2001. We conclude that this adds nothing to appellants' other arguments. The prospectus at issue here, that of June 7, 2001, included no graph or table or statement of daily (or weekly or monthly) natural gas prices over any period of time; it merely correctly stated that "[f]rom two year lows in February 1999 to June 6, 2001, . . . NYMEX closing current natural gas contract prices have increased by approximately 133%," and it specifically noted the volatile nature of gas prices and that they had varied substantially.[24] Moreover, such prices were a part of the readily available public domain information.

In a similar case, *Zucker v. Quasha*, 891 F. Supp. 1010, 1015 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (Table)(3d Cir. 1996), a

_____

[24]We also observe that the amended complaint makes no mention of or reference to the January 2001 draft prospectus.

27

prospectus issued three days before the close of the first quarter of 1994. The issuer was a retailer whose policy allowed customers to return unsold merchandise, and the prospectus gave the previous year's (1993) rate of returns, which was 13%. However, plaintiffs claimed that during the first quarter of 1994, the rate of returns had increased to 15%. The court determined that the retailer did not have to include this information in its prospectus, and dismissed plaintiffs' claim that the accurate representation of the 13% return rate for the last full year before the public offering was misleading.

Though it did not expressly address trends in Item 303, we find *Zucker* to be informative. Like Torch's disclosures, the *Zucker* court noted that the 13% return rate, which was accurate, "was not a prediction but a statement of historical performance. . . . [The retailer] did not predict future return rates or suggest that the 1993 rate was expected to continue. Therefore, the subsequent increase in the return rate during the first quarter of 1994, in progress at the time of the Public Offering, did not render this statement of historical fact illegally false or misleading." 891 F.Supp. at 1015.

The court also stated, "data concerning a quarter that is in progress is necessarily incomplete." *Id*. at 1016. Although here the decrease in the price of natural gas had been occurring since December 28, 2000, there was no complete picture, nor did Torch

28

make representations or infer that the price would continue, either up or down, but rather highlighted its volatility.  We hold that the referenced decrease in the price of natural gas was not a trend required to be disclosed by Item 303.  *See also In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1418-19 (9th Cir. 1994) (court did not impose liability based upon corporate official's failure to disclose financial data for the fiscal quarter in progress where claim alleged that the prospectus failed to disclose how far sales were lagging behind internal sales projections for the quarter in progress during IPO).

*3. Section 15 claim*

It is questionable whether appellants adequately briefed their section 15 claim, 15 U.S.C. § 77o, to this Court.[25] Regardless, because they have failed to allege a Section 11 violation, their section 15 claim must fail as well.  *See Klein v. General Nutrition Companies, Inc*., 186 F.3d 338, 344 (3d Cir. 1999).

**Conclusion**

---

[25] Section 15 concerns Liability of controlling persons: "Every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under section[] 77k . . . shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."  15 U.S.C. § 77o.

The district court properly granted defendants' motions to dismiss because the statements in the prospectus concerning natural gas prices were neither false nor materially misleading. Furthermore, the decrease in the price of natural gas was not a trend required to be disclosed by Item 303 of SEC regulation S-K.

For the foregoing reasons, the district court's grant of defendants' Rule 12(b)(6) motions to dismiss is

AFFIRMED.

30