**In re DYNEGY, INC. SECURITIES LITIGATION.**

**Pirelli Armstrong Tire Corporation Retiree Medical Benefits Trust, et al., Plaintiffs,**

**v.**

**Dynegy, Inc., et al., Defendants.**

**No. CIV.A.H–02–1571.**

United States District Court, S.D. Texas, Houston Division.

Jan. 3, 2005.

Clerk.

Kevin Tod Abikoff, Hughes Hubbard et al., Washington, DC, John D Aldock, Shea & Gardner, Washington, DC, Michael J. Chepiga, Attorney at Law, New York, NY, Richard W. Clary, Cravath Swaine et al., New York, NY, Roger Brian Cowie, Locke Liddell et al., Dallas, TX, Benjamin Rudolph Delson, Simpson Thatcher et al., New York, NY, C W Flynn, IV, Locke, Purnell, Rain & Harrell, Dallas, TX, Harrison J. Frahn, IV, Simpson Thacher et al., Palo Alto, CA, Michael E. Gertzman, Paul Weiss et al., New York, NY, Robin C. Gibbs, Gibbs & Bruns, Houston, TX, Mark K. Glasser, King & Spalding, Houston, TX, Thomas C. Godbold, Fulbright & Jaworski, Houston, TX, Russell Hardin, Jr., Rusty Hardin and Associates, Houston, TX, Dennis G. Herlong, Attorney at Law, Houston, TX, Jeffrey Lloyd Joyce, Winstead, Sechrest & Minick, Houston, TX, Brad S. Karp, Paul Weiss et al., New York, NY, Charles G. King, III, King & Pennington LLP, Houston, TX, Andrew B. Kratenstein, Cravath Swaine and Moore, New York, NY, Darin P. McAtee, Cravath, Swaine and Moore, New York, NY, Lynn K. Neuner, Sympson Thacher et al., New York, NY, Julia A. North, Cravath, Swaine and Moore, New York, NY, Bairbre O'Neill, Paul Weiss et al., New York, NY, Michael T. Powell, Haynes and Boone, Houston, TX, Kelly A. Rocco, Cravath, Swaine & Moore LLP, New York, NY, Jacalyn D. Scott, Wilshire Scott et al., Houston, TX, William F. Sheehan, Goodwin, Procter LLP, Washington, DC, David D. Sterling, Baker Botts LLP, Houston, TX, Robyn F. Tarnofsky, Paul Weiss et al., New York, NY, Julia L. Tarver, Paul Weiss et al., New York, NY, Daniel H. Weiner, Attorney at Law, New York, NY, Michael M. Wilson, Wilson Fulkerson LLP, Houston, TX, Richard M. Wyner, Shea & Gardner, Washington, DC, Michael W. Youtt, King & Spalding, Houston, TX, Christopher E. Palmer, Goodwin Procter LLP, Washington, DC, for Defendants.

Theodore C. Anderson, Kilgore & Kilgore PLLC, Dallas, TX, Daniel L. Berger, Bernstein, Litowitz Berger and Grossman, New York, NY, Thomas E. Bilek, Houston, TX, Roger Farrell Claxton, Claxton & Hill PLLC, Dallas, TX, Tom Alan Cunningham, Cunningham Darlow et al., Houston, TX, William B. Federman, Federman & Sherwood, Oklahoma City, OK, Eitan Misulovin, Bernstein Litowitz et al., New York, NY, Daniel James Petroski, Jr, Vahldiek Cano et al., Houston, TX, Robert Rivera, Jr., Susman Godfrey LLP, Houston, TX, for movants.

James D. Baskin, III, The Baskin Law Firm, Austin, TX, Alexandria S. Bernay, Lerach, Couglin et al. LLP, Los Angeles, CA, Connie Cheung, Milberg Weiss et al., San Francisco, CA, Patrick J. Coughlin, Milberg Weiss et al., San Francisco, CA, Patrick V. Dahlstrom, Pomerantz Haudek et al., Chicago, IL, John G. Emerson, Jr., Emerson Poynter LLP, Houston, TX, Roger B. Greenberg, Schwartz Junell et al., Houston, TX, Harvey Greenfield, Attorney at Law, New York, NY, Tor Gronborg, Lerach, Couglin, Stoia, et al., San Diego, CA, Helen J. Hodges, Lerach, Couglin, et al., Los Angeles, CA, Fred Taylor Isquith, Attorney at Law, New York, NY, James I. Jaconette, Lerach, Couglin, Stoia, Geller, et al., Los Angeles, CA, William S. Lerach, Lerach, Coughlin, Stoia, Geller, et al., Los Angeles, CA, John A. Lowther, Lerach, Couglin, Stoia, LLP, Los Angeles, CA, Azra Z. Mehdi, Milberg, Weiss, et al., San Francisco, CA, Susan Salvetti, Attorney at Law, New York, NY, Steven G. Schulman, Milberg, Weiss, et al., New York, NY, Trig R. Smith, Lerach, Coughlin, Stoia et al., San Diego, CA, Paul Thomas Warner, Reich & Binstock, Houston, TX, for plaintiffs.

## *MEMORANDUM AND ORDER*

LAKE, District Judge.

This action is brought against Dynegy, Inc. (DI) and others for violation of federal securities law. Pending before the court is Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims (Docket Entry No. 413), in which Lead Plaintiff seeks certification for two classes. The first class consists of persons seeking relief for alleged violations of §§ 11 and 15 of the Securities

Act of 1933 (1933 Act), 15 U.S.C. §§ 77k and 77o, during a proposed class period beginning on December 20, 2001, and ending on July 22, 2002.[1] The second class consists of persons seeking relief for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, during a proposed class period beginning on April 2, 2001, and ending on July 22, 2002.[2] For the reasons explained below the motion for class certification will be granted in part and deferred in part.

## I. Standard of Review

An action may proceed as a class action only if the party seeking certification demonstrates that (1) the proposed class meets the four criteria stated in Federal Rule of Civil Procedure 23(a), and (2) the proposed class fits into one of the three categories described in Federal Rule of Civil Procedure 23(b). *See Vizena v. Union Pacific Railroad Co.*, 360 F.3d 496, 502–503 (5th Cir.2004) (per curiam). *See also Horton v. Goose Creek Ind. School Dist.*, 690 F.2d 470, 484 & n. 25 (5th Cir.1982), *cert. denied*, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983) (Although "[t]echnically, only the requirements of section (a) of Rule 23 are 'prerequisites' to a class action," the Fifth Circuit treats "qualification for a Rule 23(b) category as a prerequisite to class actions."). On a motion for class certification "the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974) (quoting *Miller v. Mackey International, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971)). The party seeking certification bears the burden of proof. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 & n. 4 (5th Cir.2001). Although district courts have wide discretion in deciding the issue of certification, *see Vizena*, 360 F.3d at 502, district courts are, nevertheless, required to conduct a rigorous analysis of Rule 23's requirements

before deciding to certify a class. *See id.* (citing *Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996)). *See also General Telephone Co. v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982). In order to make a meaningful certification decision, the court must understand the facts, claims, defenses, and substantive law. *Castano*, 84 F.3d at 744. Although the court should not reach the merits of the case, it must consider how the plaintiffs' claims will be tried. *Id. See also Eisen*, 94 S.Ct. at 2152–2153.

### A. Rule 23(a) Requirements

To satisfy the requirements of Rule 23(a) Lead Plaintiff must demonstrate for each class that it seeks to certify that

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)(1)-(4).

#### 1. Numerosity

■ To satisfy the numerosity requirement Lead Plaintiff must show that "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). A plaintiff need not show the precise number of persons in the class to satisfy the requirement that joinder is impracticable where such a conclusion is clear from reasonable estimates. *See Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir.1981). The actual number of class members is not a determinative question because "the proper focus (under Rule 23(a)(1)) is not on numbers alone, but on whether joinder of all members is practicable." *Id.* Factors other than the actual or estimated number of purported class members may be relevant to

---

**1.** Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 1.

**2.** *Id.*

the numerosity question, e.g., the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim. *Id.* The Fifth Circuit has found reasonable the assumption that "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'" *Id.* at 1039 ("In class actions brought on behalf of securities traders, federal trial courts are quite willing to accept common sense assumptions in order to support findings of numerosity.").

### 2. Commonality

To satisfy the commonality requirement Lead Plaintiff must show that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). *See also James v. City of Dallas,* 254 F.3d 551, 570 (5th Cir. 2001), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 919, 151 L.Ed.2d 884 (2002). This requirement is not demanding and is satisfied if at least one issue's resolution will affect all or a significant number of class members. *Id.* The presence of some plaintiffs having different claims or claims that require some individualized analysis does not defeat commonality. *Id.*

### 3. Typicality

The typicality requirement of Fed.R.Civ.P. 23(a)(3) is satisfied where "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The Fifth Circuit has stated that

> the test for typicality is not demanding. It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. Typicality does not require a complete identity of claims. Rather, the critical inquiry is whether the class representatives' claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and share the

same legal theory, factual differences will not defeat typicality.

*Stirman v. Exxon Corp.,* 280 F.3d 554, 562 (5th Cir.2002) (quoting *James v. City of Dallas,* 254 F.3d at 571 (5th Cir.2001)). The typicality requirement protects class members from representation by a party who is preoccupied with a defense that is applicable only to himself. *Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 747 (5th Cir.1984). "Where unique defenses against a named plaintiff exist, the [c]ourt must consider the potential danger that the attention to this individual defense might harm the class." *See Zachery v. Texaco Exploration & Production, Inc.,* 185 F.R.D. 230, 240 (W.D.Tex. 1999) (citing *Zenith Laboratories, Inc. v. Carter–Wallace, Inc.,* 530 F.2d 508, 512 (3d Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 85, 50 L.Ed.2d 91 (1976)). *See also Lehocky v. Tidel Technologies, Inc.,* 220 F.R.D. 491, 501 (S.D.Tex.2004) (key inquiry for typicality is whether class representative would be required to devote considerable time to rebut defendant's claim).

### 4. Adequacy

■ The adequacy requirement of Fed. R.Civ.P. 23(a)(4) is satisfied where "the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4). "Rule 23's adequacy requirement encompasses class representatives, their counsel, and the relationship between the two." *Stirman,* 280 F.3d at 563 (quoting *Berger,* 257 F.3d at 479). "The adequacy requirement mandates an inquiry into (1) the zeal and competence of the representative's counsel and ... (2) the willingness and ability of the representative to take an active role in and control the litigation and to protect the interests of absentees." *Berger,* 257 F.3d at 479 (quoting *Horton,* 690 F.2d at 484). "Differences between the named plaintiffs and the class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *James,* 254 F.3d at 570 (quoting *Mullen v. Treasure Chest Casino, L.L.C.,* 186 F.3d 620, 625–626 (5th Cir.1999), *cert. denied,* 528 U.S.

1159, 120 S.Ct. 1169, 145 L.Ed.2d 1078 (2000)).

## B. Rule 23(b) Requirements

A class that satisfies all of Rule 23(a)'s requirements must also satisfy at least one of Rule 23(b)'s three requirements. *See Vizena*, 360 F.3d at 502–503, *Horton*, 690 F.2d at 484 & n. 25. Rule 23(b)'s three requirements reflect a balance between the need for and efficiency of a class action and the class members' interests in pursuing their claims separately or not at all. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 412 (5th Cir. 1998). Lead Plaintiff seeks certification under Fed.R.Civ.P. 23(b)(3), which states that an action may be maintained as a class action if the court finds that the questions of law or fact common to the members of the class predominate over questions affecting only individual members and that a class action is superior to other available methods for adjudicating the controversy. Classes certified under Rule 23(b)(3) include large-scale, complex litigations for money damages, *id.*, and require notice to the potential class members and the opportunity to opt out of the class. *See* Fed.R.Civ.P. 23(c)(2)(B).

### 1. *Predominance*

To satisfy the predominance requirement of Rule 23(b)(3), Lead Plaintiff must establish that issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over issues that are subject only to individualized proof. *See Allison*, 151 F.3d at 419, 425; *Castano*, 84 F.3d at 741. Rule 23(b)(3)'s predominance requirement is "more stringent" and "far more demanding than" the commonality requirement of Rule 23(a). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2243, 138 L.Ed.2d 689 (1997). "Common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir.1986). Courts frequently find the requirement not met where, notwithstanding the presence of common legal and factual issues sufficient to satisfy the commonality requirement, individualized inquiries predominate. *See e.g., Allison*, 151 F.3d at 402; *Castano*, 84 F.3d at 734. Nevertheless, the Supreme Court has acknowledged that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem*, 117 S.Ct. at 2250.

### 2. *Superiority*

The superiority prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. Fed.R.Civ.P. 23(b)(3). *See also Eisen*, 94 S.Ct. at 2140. When determining whether a class action is superior to other means of adjudication courts consider: (1) the class members' interest in individually controlling their separate actions, (2) the extent and nature of existing litigation by class members concerning the same claims, (3) the desirability of concentrating the litigation in the particular forum, and (4) the likely difficulties of managing a class action. Fed.R.Civ.P. 23(b)(3)(A)-(D).

## II. *Certification for the 1933 Act Class*

■ Lead Plaintiff seeks certification for a class consisting of

> all persons who purchased stock issued in Dynegy's 12/20/01 Offering of Class A Common Stock, between 12/20/01 and 7/22/02. On Behalf of this class, Lead Plaintiff alleges violations of §§ 11 and 15 of the Securities Act of 1933 (the "1933 Act Class").[3]

Defendants oppose certification of the 1933 Act Class on grounds that Lead Plaintiff lacks standing to assert a claim under the 1933 Act, and has failed to satisfy the typicality and adequacy requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b). Should the court conclude that Lead Plaintiff has satisfied Rule 23's requirements, defendants argue that Lead Plaintiff's proposed class definition is overbroad. Both standing and class certification must be addressed on a claim-by-claim basis. *James*, 254 F.3d at 563 (citing *Steel Co. v. Citizens for a Better Environ-*

**3.** *Id.*

*ment,* 523 U.S. 83, 118 S.Ct. 1003, 1018, 140 L.Ed.2d 210 (1998)).

## A. Lead Plaintiff's 1933 Act Claims

### 1. *Elements of Lead Plaintiff's 1933 Act Claims*

#### (a) Elements of a § 11 Claim

"Section 11 of the 1933 Act allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." *Herman & MacLean v. Huddleston,* 459 U.S. 375, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983). In *Herman & MacLean,* 103 S.Ct. at 687, the Court explained that § 11

> was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.

■ The elements of a § 11 claim are (1) an omission or misstatement (2) of a material fact required to be stated or necessary to make other statements made not misleading. *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1445 (5th Cir.1993). "A 'material' fact is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available about the proposed investment." *Id. See also Kapps v. Torch Offshore, Inc.,* 379 F.3d 207, 213–214 (5th Cir. 2004) ("A fact is material 'if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision.") (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 983, 985, 99 L.Ed.2d 194 (1988)). Actual knowledge of falsity is not an element of a § 11 claim, and the § 11 plaintiff generally does not have to establish scienter. *Herman*

*& MacLean,* 103 S.Ct. at 687 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1976)).[4]

#### (b) Elements of a § 15 Claim

■ Section 15 of the Securities Act defines controlling person liability. It provides that

> Every person who, by or through stock ownership, agency, or otherwise ... controls any person liable under section[ ] 77k ... shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. "The term 'control' means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Although worded differently, the control-person-liability provisions of § 15 of the 1933 Act and § 20(a) of the 1934 Act are interpreted in the same manner. *See Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 n. 15 (5th Cir.1993), *cert. denied sub nom. Turnbull v. Home Insurance Co.,* 510 U.S. 1177, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994).

To state a claim for control person liability a plaintiff must allege that a primary violation was committed and that the defendant directly or indirectly controlled the violator. *See Kapps,* 379 F.3d at 221 (citing *Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338, 344 (3d Cir.1999)). Control can be established by demonstrating that the defendant possessed the power to direct or cause the direction of the management and policies of ... a person through ownership of voting securities, by contract, business relationships, interlocking directors, family relations,

---

4. An exception to the no-scienter-requirement is created by § 27A(c) of the Private Securities Litigation Reform Act (PSLRA). To impose liability on a defendant for "forward-looking" statements a plaintiff must demonstrate that the speaker or approving officer had actual knowledge of the false and misleading statement made on behalf of the corporation. 15 U.S.C. § 77z–2(c)(1)(B)(i).

or the power to influence and control the activities of another. *See Ellison v. American Image Motor Co. Inc.*, 36 F.Supp.2d 628, 638–639 (S.D.N.Y.1999) (applying same test to 1933 Securities Act § 15 claims and 1934 Exchange Act § 20(a) claims, 15 U.S.C. § 78t(a)).

### 2. *Lead Plaintiff's Factual Allegations*

Lead Plaintiff's claims for violation of the 1933 Act arise from DI's issuance of allegedly false financial statements and other untrue statements about its own operating performance and that of Dynegy Holding, Inc. (DHI) that were either stated or incorporated into the registration statement underlying DI's offering of Class A Common Stock on December 20, 2001.[5] Lead Plaintiff alleges that the DI Class A common stock that it purchased on December 20, 2001, was offered pursuant to a registration statement dated July 27, 2001 (SAC ¶ 131), that the registration statement was "false and misleading . . . [because it] omitted to state facts necessary to make the statements made not misleading and failed to adequately disclose material facts." (SAC ¶ 165) Lead Plaintiff alleges specifically that the registration statement for the December 20, 2001, stock offering incorporated the Companies' (i.e., DI and DHI) 2000 Forms 10–K (SAC ¶ 131) as well as their first(SAC ¶ 131) and second(SAC ¶ 56) quarter 2001 Forms 10–Q. Lead Plaintiff also alleges that this registration statement incorporated by reference all documents filed pursuant to § 13(a) of the Exchange Act prior to the offering date, including the Companies' subsequently filed third-quarter 2001 Forms 10–Q because they were issued prior to the December 20, 2001, offering. (SAC ¶¶ 131, 133) [6]

5. See First Amended Consolidated Complaint for Violations of the Securities Act of 1933 (SAC, Docket Entry No. 315), ¶¶ 1, 131, 164.

6. DI's 2000 10–K, filed on March 13, 2001, is Exhibit 3, DI's second-quarter 2001 Form 10–Q is Exhibit 4, and DI's third-quarter 2001 Form 10–Q is Exhibit 5 in the Appendix in Support of Defendants' Motions to Dismiss, Docket Entry No. 330.

7. Lead Plaintiff alleges that DHI's third-quarter 2001 Form 10–Q reported cash flow from operations as $642 million when they were actually

Lead Plaintiff alleges that the Companies' 2000 Forms 10–K were false and misleading because they omitted key terms of the Black Thunder transaction (SAC ¶ 46) and overstated net income for DI by $12 million and for DHI by $2 million due to errors in accounting for tax matters (SAC ¶¶ 89–90). Lead Plaintiff alleges that the second-quarter 2001 Form 10–Q contained false statements about earnings and cash flow from operations due to improper accounting for Project Alpha (SAC ¶ 56), and that the third-quarter 2001 Form 10–Q overstated cash flow from operations for the nine months ended September 30, 2001, by $182 million due to improper accounting for Project Alpha (SAC ¶¶ 136–137).[7] Lead Plaintiff also alleges that "beginning with the third quarter 2001, . . . [Dynegy's] prior forward power curve methodology failed to appropriately reflect the value of its long-term power contracts" (SAC ¶ 83), and that when in January of 2003 Dynegy corrected this methodology the correction "resulted in a $94 million . . . reduction to previously reported 2001 net income." (SAC ¶ 83) Lead Plaintiff also alleges that DI's reported earnings for 2000 and 2001 would have been materially lower had DI correctly recorded impairments to its telecommunication assets and goodwill; impairments that were eventually reported in their 2002 Forms 10–K filed in April of 2003 when the write-off of $897 million in goodwill associated with the Wholesale Energy Network segment was announced (SAC ¶ 100).

### B. Lead Plaintiff's Standing to Assert 1933 Act Claims [8]

Citing *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 873 (5th Cir.2003), defendants assert that

$460 million, representing on overstatement of $182 million.

8. The parties' arguments as to standing do not differentiate between Lead Plaintiff's § 11 and § 15 claims. This is not surprising since § 15 control-person liability is predicated on § 11 liability. *See Kapps*, 379 F.3d at 221 (To state a claim for control-person liability a plaintiff must allege that a primary violation was committed and that the defendant directly or indirectly controlled the violator.). Therefore, the court's Rule 23(a) analysis focuses on § 11.

[a § ] 11 claim for a false registration statement exists only for purchasers of "such security," 15 U.S.C. § 77k(a), which in this case requires a demonstrable nexus between the December 2001 Offering and [Lead Plaintiff's] particular purchases of Dynegy stock.[9]

Defendants argue that "[Lead] Plaintiff has made absolutely no showing of its own standing to assert a claim under Section 11 of the Securities Act." [10] Defendants also argue that Lead Plaintiff has failed

> to demonstrate how the aftermarket purchasers it seeks to include in the Putative [19]33 Act Class—extending from December 20, 2001 to July 22, 2002—can possibly demonstrate Section 11 standing. At the time of the offering, over 200 million pre-existing shares of Dynegy Class A Common Stock were issued and outstanding.[11]

### 1. Standard of Review

Standing is a jurisdictional requirement that focuses on the party seeking to invoke federal court jurisdiction. *See James*, 254 F.3d at 562. "If the litigant fails to establish standing, he or she may not seek relief on behalf of himself or herself or any other member of the class." *Id.* at 563 (citing *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). The Supreme Court has recognized three requirements of Article III standing

> It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of... Third, it must be likely, as opposed to merely spec-

ulative, that the injury will be redressed by a favorable decision."

*United States v. Hays*, 515 U.S. 737, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 2136–2137, 119 L.Ed.2d 351 (1992)). "Even though the certification inquiry is more straightforward, [courts] must decide standing first, because it determines the court's fundamental power even to hear the suit." *Rivera*, 283 F.3d at 319 (citing *Steel*, 118 S.Ct. at 1012). *See also James*, 254 F.3d at 562 & n. 9, and *Bertulli v. Independent Association of Continental Pilots*, 242 F.3d 290, 294 (5th Cir.2001) ("[s]tanding is an inherent prerequisite to the class certification inquiry").

### 2. Lead Plaintiff's Standing

As evidence of its standing to represent a class of plaintiffs who acquired DI common stock that can be traced to the registration statement issued for the December 20, 2001, stock offering, Lead Plaintiff cites the Amended Certification that it filed on July 20, 2004, in which it states that it purchased 50,000 shares of DI common stock on December 20, 2001, at the price of $20.75 per share.[12] Lead Plaintiff submits the Declaration of its in-house counsel, Christopher M. Patti, who states that

> [t]he Regents purchased Dynegy Class A Common stock issued in Dynegy's offering on December 20, 2001. Attached as Ex. 2 is a listing of The Regents' Dynegy stock purchases... The purchases on December 20, 2001 were at a price of $20.75 per share, which was the offering price in the offering.[13]

Also attached to the Patti declaration is a copy of the "Definitive Prospectus Supplement" dated December 19, 2001, which states that the public offering price for the Class A common stock offered on December 20, 2001,

---

**9.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, p. 22.

**10.** *Id.*

**11.** *Id.* (citing Excerpt from DI's December 19, 2001, Prospectus Supplement at S–3, included in Exhibit 13 of Appendix in Support of Defendants' Opposition, Docket Entry No. 432).

**12.** See Schedule A of Exhibit A attached to Notice of Filing of Amended Certifications by Lead Plaintiff (Docket Entry No. 393).

**13.** Declaration of Christopher M. Patti, Docket Entry No. 442, and Exhibit 2 attached thereto.

was $20.75.[14] Lead Plaintiff also submits a printout from an internet website showing that on December 20, 2001, previously issued shares of DI common stock traded on the New York Stock Exchange at prices ranging from a high of $24.75 to a low of $22.60.[15] *See Collmer v. U.S. Liquids, Inc.,* 268 F.Supp.2d 718, 723 n. 2 (S.D.Tex.2003) (courts may "take judicial notice of stock prices"). *See also LaGrasta v. First Union Securities, Inc.,* 358 F.3d 840, 842 (11th Cir. 2004) (same). Lead Plaintiff argues that the evidence it has submitted in support of its motion for class certification demonstrates that it purchased DI common stock in the offering of December 20, 2001, and that because it purchased DI common stock in that offering that it has standing to pursue a § 11 claim arising from the alleged incorporation of false statements of material fact into the registration statement for the offering.

■ Section 11(a) of the 1933 Act, 15 U.S.C. § 77k, creates a cause of action based on false statements made in registration statements. That section provides that

> [i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact ... any person acquiring such security ... may either at law or in equity, in any court of competent jurisdiction [bring an action against the culpable parties].

15 U.S.C. § 77k(a). The phrase "any person acquiring such security" used in § 11 has been limited to "purchasers of shares issued and sold pursuant to the challenged registration statement." *7547 Corp. v. Parker & Parsley Development Partners,* 38 F.3d 211, 223 (5th Cir.1994) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 1925, 44 L.Ed.2d 539 (1975) (observing that sections 11(a) and 12 of the 1933 Act "are by their terms expressly limited to purchasers and sellers of securities")). *See also Rosenzweig,* 332 F.3d at 873 (holding that

"anyone who can 'trace' his shares to the challenged registration statement (i.e., not merely the initial purchasers) may sue under § 11").

For the purpose of ruling on the pending motion for class certification, the court concludes that the evidence submitted by Lead Plaintiff is sufficient to show that Lead Plaintiff purchased DI stock in the December 20, 2001, offering of Class A common stock, and that as a purchaser in that offering Lead Plaintiff has standing to pursue a § 11 claim arising from the registration statement for that offering. *See 7547 Corp.,* 38 F.3d at 223–225.

### 3. *Standing of Absent Class Members*

■ Defendants argue that Lead Plaintiff has failed "to demonstrate how the aftermarket purchasers it seeks to include in the Putative [19]33 Act Class—extending from December 20, 2001 to July 22, 2002—can possibly demonstrate Section 11 standing."[16] The court is not persuaded by this argument because once the court has concluded that a class representative has the right to sue, "the propriety of awarding classwide relief ... does not require a demonstration that some or all of the unnamed class could themselves satisfy standing requirements for named plaintiffs." *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2201, 135 L.Ed.2d 606 (1996) (Souter, J., joined by Ginsburg, J., and Breyer, J., concurring in part, dissenting in part, and concurring in judgment).

> Unnamed plaintiffs need not make any individual showing of standing [in order to obtain relief], because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court. Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article II case or

---

**14.** See Exhibit 3 attached to Declaration of Christopher M. Patti, Docket Entry No. 442.

**15.** See Exhibit 20 included in Appendix in Support of Lead Plaintiff's Reply in Support of Motion for Class Certification, Docket Entry No. 443.

**16.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, p. 22 & n. 32 (citing Excerpt from DI's December 19, 2001, Prospectus Supplement at S–3, included in Exhibit 13 of Appendix in Support of Defendants' Opposition, Docket Entry No. 432).

controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions.

*Id.* at 2201–2202. *See also* 7B Wright & Miller § 1785.1, at 141 ("As long as the representative parties have a direct and substantial interest, they have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation."). Moreover, aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under § 11 of the 1933 Act. *See Rosenzweig* 332 F.3d at 872 (observing that "all four courts of appeals to address the question have held that ... aftermarket purchasers have standing to sue under § 11.11"). *See also Columbia General Investment Corp. v. S.E.C.,* 265 F.2d 559, 562 (5th Cir.1959) ("Persons other than those who purchase the new stock under the Registration [statement] may be affected in point of fact and may, under certain circumstances, have remedies in point of law for misrepresentations in a Registration [statement].").

## C. Lead Plaintiff's Satisfaction of Rule 23(a)'s Requirements

Defendants contest Lead Plaintiff's ability to satisfy the class certification requirements of typicality and adequacy; but do not contest Lead Plaintiff's satisfaction of the numerosity and commonality requirements. Nevertheless, because "it is improper for a district court to certify a class action without first demonstrating that the plaintiff has satisfied each of the requirements of Rule 23," *Vizena,* 360 F.3d at 503, the court will address each of the Rule 23 requirements. *See Castano,* 84 F.3d at 740 (district courts are required to conduct a rigorous analysis of Rule 23's requirements before deciding to certify a class). *See also Stirman,* 280 F.3d at 563 & n. 7 ("Even if [defendant] had

stipulated to certification, the court was bound to conduct its own thorough [R]ule 23(a) inquiry. The purpose of this analysis is to protect unknown or unnamed potential class members, and by definition those people do not and cannot participate in any stipulations concocted by the named parties.").

### 1. *Numerosity*

Lead Plaintiff argues that the impracticability of joining all class members satisfies Rule 23(a)(1)'s numerosity requirement.[17] Attached to the Patti Declaration is a copy of the "Definitive Prospectus Supplement" dated December 19, 2001, which quantifies the public offering of Dynegy Class A Common Stock at 25,000,000 shares.[18] The "Definitive Prospectus Supplement" also shows that at the time of the offering DI stock was traded nationally on the New York Stock Exchange. Based on the information included in the "Definitive Prospectus Supplement," Lead Plaintiff estimates that there are thousands of putative § 11 class members nationwide.[19]

Defendants do not dispute Lead Plaintiff's assertions that 25,000,000 shares were included in the December 20, 2001, stock offering, or that putative § 11 class members are geographically diverse. Because there can be no doubt that the December 20, 2001, stock offering consisted of millions of shares of stock, that the proposed 1933 Act Class is a nationwide class, or that the identities of its individual members are not readily ascertainable, the court concludes that joinder of all class members is impracticable. *See Zeidman,* 651 F.2d at 1038–1039 (discussing a number of facts other than the actual or estimated number purported class members may be relevant to "numerosity question"). *See also Greenwald v. Integrated Energy, Inc.,* 102 F.R.D. 65, 68 (S.D.Tex.1984) (numerosity requirement satisfied where investors traded millions of shares during the class period); *Mertz v. Harris,* 497 F.Supp. 1134, 1138 (S.D.Tex.1980) (probable geo-

17. Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, pp. 8–9.

18. See Exhibit 3 attached to Declaration of Christopher M. Patti, Docket Entry No. 442.

19. Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, pp. 8–9.

graphic diversity of potential plaintiffs and inability to readily ascertain their identities weigh heavily in favor of finding that the numerosity requirement is satisfied).

### 2. Commonality

The only 1933 Act claims remaining in this case is the claim arising from the registration statement for DI's offering of Class A Common Stock on December 20, 2001.[20] Lead Plaintiff argues that questions of law and fact common to all members of the § 11 class include (1) whether the 1933 Act was violated by defendants' conduct; (2) whether the December 20, 2001, offering's registration statement contained untrue statements of material fact; (3) whether the December 20, 2001, offering's registration statement omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (4) the extent of damage sustained by class members and the appropriate measure of damages.[21] Lead Plaintiff argues that these questions of law and fact common to all members of the § 11 class satisfy Rule 23(a)(2)'s commonality requirement. Because § 11 imposes strict liability on issuers and signatories of a registration statement for material misrepresentations, the court concludes that the common questions of law and fact concerning the presence of false statements and/or omissions of material fact in the registration statement for the December 20, 2001, stock offering that have been identified by Lead Plaintiff satisfy Rule 23(a)(2)'s commonality requirement. *See James*, 254 F.3d at 570.

### 3. Typicality

Lead Plaintiff argues that its claims are typical of the claims of the absent § 11 class members because its claims and the "class member claims arise from defendants' common scheme and course of conduct through fraudulent transactions used to artificially affect the market price for Dynegy's publicly traded securities." [22] Lead Plaintiff also argues that the § 11 claims are based on facts that are not unique to it because its claims and those of the other class members arise from their investments in DI securities.[23] Because, like the absent members of the putative § 11 class, Lead Plaintiff invested in the DI Class A Common Stock traceable to the December 20, 2001, stock offering, and because proof of Lead Plaintiff's § 11 claim that the registration statement for the stock offering contained false statements and omissions of material fact will necessarily prove the § 11 claims of the absent class members, the court concludes that Lead Plaintiff's § 11 claim is typical of the § 11 claims possessed by the absent class members. *See Stirman*, 280 F.3d at 562; *James*, 254 F.3d at 571.

Defendants argue that unique reliance issues, class period divestitures, and inter-class conflicts render Lead Plaintiff's claims atypical.[24]

#### (a) Reliance Issues

■ Asserting that Lead Plaintiff continued to buy DI stock after Dynegy's April 25, 2002, reclassification of cash flows related to Project Alpha, defendants argue that Lead Plaintiff is potentially subject to unique reliance defenses not applicable to other putative class members.[25] The certification filed

**20.** See Memorandum and Order of October 7, 2004 (Docket Entry No. 399), pp. 105–117, 143–145 (dismissing 1933 Act claims arising from DHI's 8.75% Notes offered on February 15, 2002). See also Lead Plaintiff's Notice of Dismissal of Certain 1933 Act Claims Against Certain Defendants, Docket Entry No. 416, dismissing without prejudice claims asserted in the First Amended Consolidated Complaint for Violations of the Securities Act of 1933 based on DHI's 6.875% Notes offered on March 15, 2001, and stating that "Lead Plaintiff will continue to pursue the 1933 Act claims for the December 20, 2001 Common Stock Offering and the 1934 Act claims against the remaining defendants, as set

forth in the Court's October 7, 2004 Memorandum and Order [Docket Entry No. 399]."

**21.** Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 10.

**22.** *Id.* at p. 12.

**23.** *Id.*

**24.** *Id.* at pp. 11–13.

**25.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, pp. 11–15.

by Lead Plaintiff in July of 2004 shows that its last purchases of DI stock were made on May 6 and May 7 of 2002.[26] For the reasons explained in the Memorandum and Order of October 7, 2004, the court has already concluded that the disclosures made prior to May 15, 2002, were not sufficient to place plaintiffs on inquiry notice of claims arising from Project Alpha. Accordingly, the court is not persuaded that Lead Plaintiff's purchases in early May of 2002, prior to the inquiry notice date, are likely to subject it to a unique defense that will not be shared by other members of the putative class. Moreover, courts have ruled that purchases of stock by class representatives after negative announcements during the class period, or even after the close of the class period, do not destroy typicality. *See Lehocky*, 220 F.R.D. at 501–502 (majority of courts hold that a plaintiff's purchase of stock after disclosure of materially adverse information does not raise a unique defense that destroys typicality).

### (b) Class Period Divestitures

■■■ Asserting that Lead Plaintiff sold all of its shares about a month before the conclusion of the putative class period on July 22, 2002, defendants argue that Lead Plaintiff's divestitures create an equity conflict between it and putative class members who still retain their shares.[27] "This argument is founded on a doubtful assumption that has consistently been rejected by the courts." *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 208 (N.D.Tex.1997). Individual stock holdings of absent class members would have to be massive before their equity investment in the company would outweigh their personal interest in a recovery in this case. Accordingly, the court concludes that Lead Plaintiff's divestiture of all its DI stock before the end of the proposed class period does not render it an atypical plaintiff. *Id.*

### (c) Inter–Class Conflicts

■■■ Defendants argue that inter-class conflicts arising from Lead Plaintiff's attempt to serve as a representative for both the 1933 Act and the 1934 Act Classes precludes Lead Plaintiff from serving as a representative of either class.[28] Lead Plaintiff argues that

> [c]entral to both classes are claims that the defendants engaged in a scheme to both inflate and sustain Dynegy's securities prices during the proposed class periods, enabling Dynegy to hide its strained cash-flow position from operations and raise additional capital via a successful secondary stock issuance (among other things).[29]

Although defendants argue that class conflicts are compounded by Lead Plaintiff's attempt to serve as a representative for both the putative 1933 and 1934 Act Classes, defendants recognize that the existence of a conflict between the 1933 and 1934 Act Classes is speculative at best:

> Plaintiff's 1934 Act claims regarding the Black Thunder transaction have been dismissed. See 10/7/04 Order at 239–40. While Plaintiff appears to be abandoning its 33 Act claims based on that transaction, it has not done so explicitly. To the extent Plaintiff intends to press its 33 Act claim based on Black Thunder, Plaintiff suffers from a disabling conflict. While it would not be in the best interests of the Putative 34 Act Class to argue any purported price inflation or price decline attributable to Black Thunder, Plaintiff would be required to assert such inflation and loss tied to Black Thunder on behalf of the Putative 33 Act Class.[30]

Defendants explain that Lead Plaintiff "appears to be abandoning" its 1933 Act claims based on Black Thunder because its "First Request for Production of Documents served on all Defendants sought documents related solely to Project Alpha and the so-called 'round trip' trades and its Motion [for Class

---

26. See Docket Entry No. 393.

27. Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry no. 431, pp. 13–15.

28. *Id.* at p. 14.

29. Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 3.

30. Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, p. 14.

Certification] is based solely on those transactions; neither document makes any mention of Black Thunder." [31] Because the 1934 Act claims based on the Black Thunder transaction were dismissed in the court's Memorandum and Order of October 7, 2004, and because Lead Plaintiff's pending motion for class certification relies exclusively on Project Alpha and the round-trip trades with CMS, the court is not persuaded either that a conflict arising from the Black Thunder transaction exists between the putative 1933 and 1934 Act Classes or that any conflict exists that renders Lead Plaintiff's 1933 Act claims atypical. Defendants' argument, which essentially relates to damages, has been rejected by a number of courts. *See Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir.), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976) (conflict on damages does not preclude class certification unless it is imminent and at the very heart of the suit); *Kalodner*, 172 F.R.D. at 207 (same).

### 4. *Adequacy*

Lead Plaintiff asserts that "the proposed class representative and class counsel more than satisfy the Rule 23 adequacy requirements." [32] Defendants argue that Lead Plaintiff has not demonstrated its adequacy to serve as class representative or the adequacy of class counsel.

#### (a) Class Representative

Defendants argue that Lead Plaintiff has failed to demonstrate its adequacy to serve as class representative because it has failed to put forward any evidence demonstrating its direction, control, knowledge, or understanding of this lawsuit. [33] Citing *Weinstein v. American Biomaterials Corp.*, 123 F.R.D. 442, 466 (S.D.N.Y.1988), defendants also argue that "questions as to a proposed representative's credibility may prevent the party from serving as a fiduciary for absent class

members," [34] and citing *Cohen v. Laiti*, 98 F.R.D. 581, 582–583 (E.D.N.Y.1983), defendants argue that "contradictions between allegations in complaint and testimony of plaintiff . . . [may] provide sufficient basis for denial of certification." [35]

#### (1) Direction and Control of the Litigation

■ Lead Plaintiff has signed a certification in which it has agreed to serve as class representative if appointed and to provide testimony if necessary, it has stated that it neither purchased DI's securities at the direction of counsel nor will it accept payment for serving as class representative beyond its pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation as ordered or approved by the court. [36] Lead Plaintiff asserts that it

drives every aspect of the Dynegy litigation and diligently exercises its fiduciary responsibilities on behalf of the class, including:

- The Regents, through its general counsel's office, oversees the litigation, monitoring and directing Lead Counsel's investigation and prosecution strategy, reviewing and approving all pleadings, and conducting weekly status conference calls;

- The Regents' representatives will attend significant court hearings;

- The Regents filed a TRO motion seeking to enjoin Dynegy from using proceeds from asset sales to pay former executives' bonuses and thus prevent dissipation of Company assets;

- At the request of the Department of Justice, The Regents, through Lead Counsel, assisted in the Olis prosecution, making former Regents' investment manager Jeff Heil available on short no-

---

31. *Id.* at n. 25.

32. Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 13.

33. Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, pp. 15–19.

34. *Id.* at p. 5.

35. *Id.*

36. Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 15.

tice to provide key testimony, which closed the government's case; and

- The Regents, along with Lead Counsel, closely monitored the Olis trial, which unearthed new facts that were then alleged in the SEAC and SAC in January 2004.[37]

In support of these assertions Lead Plaintiff has submitted the Declaration of Christopher M. Patti in which in-house counsel for the Lead Plaintiff states that Lead Plaintiff

> has and will continue to actively oversee and supervise every aspect of the Dynegy Litigation. This oversight includes monitoring and directing Lead Counsel's initial and on-going investigation; reviewing and approving the initial complaint and the subsequent amended complaints, particularly as a consequence of the Olis criminal trial in November 2003; reviewing and approving the initial disclosures and initial paper discovery; overseeing the response by The Regent's current and former personnel to defendants' document requests and interrogatories; reviewing and approving all pleadings; and conducting weekly status conference calls on case development and the litigation strategy The Regents directs Lead Counsel to pursue. In addition, this office will participate in any settlement activities, and The Regents will make all decisions on behalf of the class with respect to proposed settlements. A representative of The Regents will attend significant court hearings and the trial. In short, no significant strategic or tactical decisions have been made or important actions taken by Lead Counsel in this case without the prior review and approval of this office.[38]

Lead Plaintiff is the governing body of a major state university system with a 26–member Board of Directors and is a large institutional investor.[39] In light of the statements made in the Patti declaration the court

concludes that Lead Plaintiff is capable of understanding and controlling this litigation.

### (2) Credibility

■ Defendants' criticism of Lead Plaintiff's credibility stems from alleged conflicts between representations made in this court and Lead Plaintiff's internal documents that defendants argue show, *inter alia,*

> (i) that Regents decided to increase its holdings after April 25, 2002, rather than deciding to sell as testified by Mr. Heil; (ii) that Regents has stated that Dynegy's decline as of May 2002 was driven by Enron and a weak economy, as opposed to the reclassification of cash flows, as suggested by Mr. Heil at the Olis trial; (iii) that Regents stated Project Alpha was not created to fabricate cash flow, as opposed to its present claim that it "artificially increased reported cash flows," 34 Act ¶ 4; (iv) that Regents believed as of May 2002 Dynegy's stock had declined more than warranted, as opposed to its present assertion that the stock remained inflated through July 22, 2002; and (v) that Regents ultimately decided to sell Dynegy stock as part of a divestiture of investments in the merchant energy sector affected by "Enronitis," and not because of Dynegy's cash flow reclassification.[40]

This argument is not persuasive. There is no doubt that honesty and integrity are important traits for class representatives. However, none of the alleged contradictions suggest that Lead Plaintiff's representatives are dishonest; what the alleged contradictions do suggest is that Lead Plaintiff continued to believe the public words of comfort about Project Alpha that defendants continued to make through April and early May of 2002 until May 15, 2002, when DI filed its first-quarter 2002 Form 10–Q with the SEC that revealed in undisputable fashion that cash flow from Project Alpha was cash flow from financing instead of cash flow from

---

**37.** *Id.* at p. 14. SEAC is the acronym for Lead Plaintiff's First Amended Consolidated Complaint for Violations of the Securities Exchange Act of 1934 (SEAC, Docket Entry No. 316).

**38.** Docket Entry No. 442, p. 1.

**39.** See Lead Plaintiff's Reply in Support of Motion for Class Certification, Docket Entry No. 441, p. 5.

**40.** *Id.* at p. 11.

operations, as originally presented; that the revenue for 2001 was $300 million less than originally reported; that the Companies' 2001 financial statements would be restated; that the auditor's report for 2001 was unreliable; and that Project Alpha would be subject to a formal investigation by the SEC.[41] Moreover, unlike the class representative in *Cohen*, 98 F.R.D. at 581, who was found to be inadequate because of his incredible statements about the key issue of reliance, the other inconsistencies raised by defendants do not relate to key issues but, instead, to minor details. *See Kalodner*, 172 F.R.D. at 210–211 (discrepancies on minor issues insufficient to render class representative inadequate).

### (b) Class Counsel

Lead Plaintiff argues that an ample record exists to demonstrate Lead Counsel's adequacy to represent the classes in this case. Lead Plaintiff offers the resumes of Lead Counsel, William Lerach of Lerach Coughlin Stoia Geller Rudman & Robbins L.L.P.,[42] and those of Schwartz, Junell, Campbell & Outhout, L.L.P.,[43] and the Provost & Umphrey Law Firm L.L.P. as evidence that its chosen attorneys are well qualified to vigorously prosecute this action at Lead Plaintiff's direction.[44] Lerach's resume states that he is "widely recognized as one of the leading securities lawyers in the United States,[45] that he founded the West Coast operations of Lerach Coughlin's predecessor firm—Milberg Weiss—almost 30 years ago, that he has prosecuted hundreds of securities class and stockholder derivative actions that have yielded billions of dollars in recoveries, and that he and his firm are involved in many of the largest and highest profile securities suits in recent years, including Enron, Dyne-

gy, AOL–TimeWarner, and WorldCom." [46] Lead Plaintiff also submits the Patti Declaration in which its in-house counsel states that

> [i]n December 2001, The Regents applied for appointment as Lead Plaintiff in the Enron Securities Litigation. At that time, The Regents carefully considered its choice of Lead Counsel. It selected Lead Counsel, then Milberg, Weiss, now Lerach, Coughlin, on the basis of its attorneys' extensive experience representing plaintiffs in securities litigation, the resources the firm had available to prosecute the case, the aggressiveness it had already demonstrated in doing so, and, after interviews with the key attorneys involved, our belief that they would work cooperatively with this office and would welcome the high level of supervision we intended to apply in our role as Lead Plaintiff. In June 2002, The Regents applied for appointment as Lead Plaintiff in this action. By that time we had acquired extensive experience working with Lead Counsel in the Enron case. We had observed first hand the skill and determination of Lead Counsel and their dedication to the best interests of the class. We had developed an extremely effective working relationship with Lead Counsel, and our role in supervision and management of every aspect of the Enron litigation had been welcomed by them. Based on this experience, as well as the similarity of many issues in the Enron and Dynegy cases, we concluded that Lead Counsel in the Enron litigation was also the best choice for Lead Counsel in this case.[47]

This declaration demonstrates that Lead Plaintiff (1) possesses the time, resources, and willingness to be a class representative

---

**41.** See Memorandum and Order of October 7, 2004, pp. 84–88.

**42.** Exhibit D attached to Appendix to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 415.

**43.** Exhibit E attached to Appendix to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 415.

**44.** Exhibit F attached to Appendix to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 415. See also Lead Plaintiff's Motion for

Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 15.

**45.** Exhibit D attached to Appendix to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 415.

**46.** *Id.*

**47.** Declaration of Christopher M. Patti, Docket Entry No. 442, pp. 1–2.

and (2) that Lead Plaintiff has selected competent counsel to represent it. Accordingly, the court concludes that Lead Plaintiff has demonstrated that it is an adequate representative for the putative § 11 class.

### 5. *Conclusions*

For the reasons explained above the court concludes that Lead Plaintiff has satisfied Rule 23(a)'s requirements with respect to the 1933 Act claims.

### D. **Lead Plaintiff's Satisfaction of Rule 23(b)'s Requirements**

Lead Plaintiff argues that the 1933 Act claims alleged in this action satisfy the requirements of Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of the controversy.[48]

### 1. *Predominance of Common Issues*

■ Citing *Durrett v. John Deere Co.*, 150 F.R.D. 555, 560 (N.D.Tex.1993), Lead Plaintiff argues that common issues predominate because the class members were subjected to the same alleged misrepresentations and omissions, which constitute a common course of conduct.[49] Citing *In re Initial Public Offering*, 2004 WL 2297401, *37–*40 (S.D.N.Y. October 13, 2004), defendants argue that "[i]ndividualized inquiries as to standing would permeate an aftermarket class in this case and therefore 'predominance' and 'superiority' cannot be established."[50] Lead Plaintiff counters that "defendants simply speculate about the evidence and need for mini-trials."[51] Lead Plaintiff argues that "the common question of whether the registration statement was materially misleading predominates over any secondary tracing issues that might be

encountered."[52] *See Schwartz v. Celestial Seasonings*, 178 F.R.D. 545, 554 & n. 4 (D.Colo.1998). Since discovery has just begun, Lead Plaintiff argues that the court should not prematurely narrow the 1933 Act Class before it has an opportunity to gather and review the relevant evidence and consult with experts.[53] The court agrees.

In *Rosenzweig*, 332 F.3d at 873, the Fifth Circuit held that aftermarket purchasers who can trace their shares to a challenged registration statement may sue under § 11. Although the court has already concluded that Lead Plaintiff has successfully demonstrated its standing to represent a class of 1933 Act members because Lead Plaintiff has shown that it acquired its shares in the offering and not in the aftermarket, no evidentiary record has yet been developed regarding how aftermarket class members can or will trace their stock acquisitions to the allegedly false and misleading registration statement. Absent such a record the court concludes that it must take under advisement the issue of class certification for a 1933 Act Class that includes members who acquired their stock in the offering and members who acquired their stock in the aftermarket and defer ruling until an evidentiary record has been developed. Because Lead Plaintiff bears the burden of showing predominance, Lead Plaintiff will be granted thirty (30) days from the entry of this Memorandum and Order in which to submit a supplemental brief and supporting evidence on this issue, defendants will be granted fifteen (15) days thereafter to file a response, and Lead Plaintiff will be granted fifteen days after defendants file their response to file a reply brief. None of these filings may exceed ten pages.

### 2. *Superiority of Class Treatment*

Lead Plaintiff argues that class action treatment is superior to any other method of

---

**48.** Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, pp. 15–16.

**49.** *Id.* at p. 16.

**50.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, p. 24.

**51.** Lead Plaintiff's Reply in Support of Motion for Class Certification, Docket Entry No. 441, p. 18.

**52.** *Id.*

**53.** *Id.*

adjudication because "it provides the fairest and most efficient adjudication,"[54] is both effective and manageable, and is the only way to afford relief to those plaintiffs whose claims are too small to permit them to bring individual suits.[55] Lead Plaintiff also argues that the class action device provides judicial efficiency by permitting common claims and issues to be tried just once. The court agrees.

In the superiority analysis courts consider several factors, including manageability and "the policy underlying Rule 23 to 'achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.'" *See Henry v. Cash Today, Inc.,* 199 F.R.D. 566, 570 (S.D.Tex.2000) (quoting *State of Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 315 (5th Cir.1978)). The court concludes that these considerations are satisfied here, and that the proposed § 11 class satisfies the requirements of Rule 23(b)(3).

### E. 1933 Act Class Period

█ Plaintiffs propose a 1933 Act class period of December 20, 2001, to July 22, 2002. Defendants argue that the § 11 class should be limited to original allocants, or to original allocants who held their stock through April 25, 2002, and to aftermarket purchasers who purchased before April 25, 2002.[56]

Citing *In re Initial Public Offering Sec. Litig.,* 2004 WL 2297401, *38 (S.D.N.Y. October 13, 2004), defendants urge the court to limit the definition of the 1933 Act Class to original allocants and to exclude aftermarket purchasers because "in a modern aftermarket containing shares from multiple offerings and other sources, 'tracing' [shares to the

December 20, 2001, offering] is impossible."[57] Defendants also argue that Lead Plaintiff has failed

to demonstrate how the aftermarket purchasers it seeks to include in the Putative [19]33 Act Class—extending from December 20, 2001 to July 22, 2002—can possibly demonstrate Section 11 standing ... [because a]t the time of the offering, over 200 million pre-existing shares of Dynegy Class A Common Stock were issued and outstanding.[58]

Lead Plaintiff responds that in *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 873 (5th Cir. 2003), the Fifth Circuit held that an aftermarket purchaser who "can 'trace' his shares to the challenged registration statement ... may sue under § 11." Because in *Rosenzweig* the Fifth Circuit clearly held that aftermarket purchasers who can trace their shares to a challenged registration statement may sue under § 11, the court is not persuaded that aftermarket purchasers should be excluded from the proposed class at this stage of the litigation. *See id.* at 873 ("The district court erred in concluding that plaintiffs did not have standing on the mere fact that they were aftermarket purchasers."). Defendants' argument that aftermarket purchasers will be unable to trace their purchases to the December 20, 2001, stock offering is an argument best addressed after a factual record has been developed.

Asserting that "[i]t is an affirmative defense to Section 11 liability that a plaintiff's losses were not attributable to the misrepresentations or omissions alleged, 15 U.S.C. § 77k(e),"[59] defendants argue that the 1933 Act Class should be limited to original allocants who held their stock through April 25, 2002, and to aftermarket purchasers who acquired their stock before April 25, 2002.[60]

---

**54.** Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 17.

**55.** *Id.*

**56.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, p. 27.

**57.** *Id.* at p. 22.

**58.** *Id.* (citing Dynegy's December 19, 2001, Prospectus Supplement at S-3).

**59.** *Id.* at p. 27.

**60.** *Id.* at pp. 27–28 & n. 43. See also *id.* at n. 42 arguing that "[t]o the extent that [Lead Plaintiff has not abandoned its 1933 Act claims based on Black Thunder], the Court may in the alternative limit any Putative [19]33 Act Class to purchasers who held their shares through March 13, 2002,

Citing Lead Plaintiff's allegation that "in late April 2002, the Company began to disclose its financial statements were false," [61] defendants argue that "[u]nder Plaintiff's theory, the so-called 'truth' concerning Project Alpha began to be disclosed in the April 25, 2002, disclosure of the reclassification of cash flows." [62] Defendants argue that original allocants who sold prior to late April of 2002 could not have suffered a loss actionable under the 1933 Act because their losses could not have been caused by misstatements that had not yet been revealed.[63] Defendants also argue that if a class including aftermarket purchasers is certified, it should end on April 25, 2002, because § 11 is only available to purchasers without knowledge of purported misstatements, and inclusion of aftermarket purchasers following this date would raise individualized issues regarding knowledge that would preclude a finding of superiority and predominance.[64] In support of these arguments defendants cite the same authorities on which they sought dismissal of plaintiff's § 11 claims pursuant to the negative causation defense.[65] *See, e.g., Akerman v. Oryx Communications, Inc.*, 810 F.2d 336 (2d Cir.1987); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248 (N.D.Cal. 2000); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F.Supp.2d 243, 253–255 (S.D.N.Y.2003).

As explained at pp. 118–119 of October 7, 2004, Memorandum and Order (Docket Entry No. 399),[66] § 11(a) of the 1933 Act imposes strict liability on issuers and other signatories of a registration statement if the registration statement contains material misrepresentations, and the plaintiffs acquired the securities without knowledge of the misrepresentations. *See* 15 U.S.C. § 77k(a); *Akerman*, 810 F.2d at 340. Because § 11(a) imposes strict liability for misrepresentations contained in a registration statement,

any decline in value is presumed to be caused by the misrepresentation. *See Akerman*, 810 F.2d at 340. Section 11(e), however, provides the following affirmative defense:

> [I]f the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e). This defense is known as the "negative causation defense." *See Akerman*, 810 F.2d at 340. If a defendant proves that the decline in the value of a security was not caused by the material omissions or misstatements in the registration statement, the plaintiff is not entitled to recover any damages. *Id.* Although the defendant's burden has been characterized by courts as "heavy," it is not insurmountable, *id.* at 341, and courts have awarded both summary judgment and Rule 12(b)(6) dismissal to defendants in appropriate cases. *See In re Fortune Systems Sec. Litig.*, 680 F.Supp. 1360, 1369–1370 (N.D.Cal.1987) (granting summary judgment); *McKesson*, 126 F.Supp.2d at 1262 (granting motion to dismiss).

Defendants have not cited and the court has not found any case that has relied on the negative causation defense to limit a putative class at the class certification stage of litigation. Moreover, district courts have been directed not to reach the merits of the action at the class certification stage of the litigation. *See Eisen*, 94 S.Ct. at 2153. Accordingly, for the reasons explained at pp. 117–

---

the date by which, under Plaintiff's theory, the 'truth' concerning alleged misstatements regarding Black Thunder was disclosed."

**61.** First Amended Consolidated Complaint for Violation of the Securities Act of 1933, Docket Entry No. 315(SAC), ¶ 3.

**62.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, pp. 27–28.

**63.** *Id.* at p. 28.

**64.** *Id.* at p. 28 & n. 43.

**65.** See Memorandum and Order of October 7, 2004, Docket Entry No. 339, pp. 117–127, esp. 125–127.

**66.** *Id.*

127 in the Memorandum and Order of October 7, 2004 (Docket Entry No. 399), the court is not persuaded that the 1933 Act Class should be limited to original allocants who held their stock through April 25, 2002, and/or to aftermarket purchasers who acquired their stock before April 25, 2002. Nor is the court persuaded that defendants' assertion of the negative causation defense will necessarily raise individualized issues of knowledge that will eclipse the court's conclusions regarding predominance and superiority. On the contrary, for the reasons explained in the October 7, 2004, Memorandum and Order (Docket Entry No. 399), the court has already concluded that plaintiffs were not placed on inquiry notice of claims arising from misrepresentations about Project Alpha until May 15, 2002, and that the question of when plaintiffs were placed on inquiry notice of claims arising from misrepresentations about Black Thunder is an issue of fact.[67]

## F. Conclusions

For the reasons explained above, the court concludes that Lead Plaintiff's motion for class certification of a class of all persons who purchased DI stock that is traceable to the December 20, 2001, offering of Class A Common Stock, and may recover under § 11 of the Securities Act of 1933 (SAC or 1933 Act) should be granted.

## III. *Certification for the 1934 Act Class*

Lead Plaintiff seeks certification for a class consisting of

all persons who purchased the publicly traded securities of Dynegy, Inc. ("Dynegy" or the "Company") between 4/2/01 and 7/22/02. On behalf of this class, Lead Plaintiff alleges violations of §§ 10(b), and SEC Rule 10b–5 promulgated thereunder, and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act Class").[68]

Defendants oppose certification of the 1934 Act Class on grounds that Lead Plaintiff has failed to satisfy the typicality and adequacy requirements of Rule 23(a) and the predominance and superiority requirements of Rule

23(b). Should the court conclude that Lead Plaintiff has satisfied Rule 23's requirements, defendants argue that Lead Plaintiff's proposed class definition is overbroad.

## A. Lead Plaintiff's 1934 Act Claims

For the reasons explained in the court's Memorandum and Order of October 7, 2004 (Docket Entry No. 399), the live § 10(b) and Rule 10b–5 claims remaining in this case are (1) the claims asserted against DI arising from Project Alpha and the round-trip trades with CMS, (2) the claims asserted against Bergstrom arising from the round-trip trades with CMS, and (3) the claims asserted against Doty arising from Project Alpha. The only live § 20(a) claims remaining are those asserted against DI and Doty.

### 1. *Elements of Lead Plaintiff's 1934 Act Claims*

#### (a) Elements of a § 10(b) Claim

Section 10(b) of the 1934 Act makes it unlawful for any person:

To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

#### (b) Elements of a Rule 10b–5 Claim

Rule 10b–5 makes it unlawful for any person, directly or indirectly,

(a) To employ any device, scheme, or artifice to defraud;

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any

---

**67.** See Docket Entry No. 399, at pp. 90–96.

**68.** Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, p. 1.

person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5(b).

### (c) Elements of a § 20(a) Claim

■ Section 20(a) of the 1934 Act defines controlling person liability. It provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). To establish controlling person liability plaintiffs must show that a primary violation was committed and that the defendants directly or indirectly controlled the violator. *See ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 348 n. 57, 362 n. 123 (5th Cir.2002). *See G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir.1981) (rejecting need to allege that the controlling person actually participated in the underlying primary violation).

### 2. *Lead Plaintiff's Factual Allegations*

#### (a) Project Alpha

Plaintiffs allege that Project Alpha was a transaction promoted and structured by Citigroup to disguise a $300 million loan as cash flow from operations and to generate bogus tax savings of $79 million. (SAC ¶¶ 53–54; SEAC ¶¶ 60–63) Plaintiffs allege that the "[c]ash flow from operations bolstered Dynegy's financial statements, which was important because the Company needed to close what was known internally as the 'disconnect,' the gap between reported earnings and actual cash flow." (SEAC ¶ 128)

Plaintiffs allege that Project Alpha was a complex transaction that consisted of three components:

(a) the loan to Dynegy through several intermediaries;

(b) a series of related, off-market natural gas transactions; and

(c) improper basis shifting that resulted in misstated tax losses, which in turn led to the reporting of increased profits.

(SAC ¶ 54; SEAC ¶ 63) Plaintiffs allege that Project Alpha used a series of phony, manipulative, off-market gas contracts to create the appearance that Dynegy's loan funding and payback was gas trading revenues and losses. The gas contracts were prewired at off-market prices, meaning the contract price had no relation to market prices other than to specifically create a purported profit or loss. Those contracts were underpriced in favor of Dynegy during months 1–9, when it borrowed $300 million, and overpriced against Dynegy in months 10–60, when it repaid the $300 million loan. As designed and executed by Citigroup, the Project Alpha loan was cloaked by . . . circular gas contracts.

(SEAC ¶ 73) Plaintiffs allege that beginning with the announcement of earnings for the second-quarter of 2001, DI's and DHI's financial statements and other representations concerning results from operations, balance sheet, finances, financial ratios, and financial discipline were false and misleading because they omitted material facts about Project Alpha. (SAC ¶ 56; SEAC ¶ 87) Plaintiffs allege that DI and DHI restated their financial statements to eliminate at least $290 million in cash flow from operations and $79 million of purported tax savings, which reduced DI's and DHI's 2001 net income by 12%. (SAC ¶ 69; SEAC ¶ 286)

#### (b) Round–Trip Trades with CMS

In the 1934 Act Complaint plaintiffs allege that Dynegy falsely portrayed the success of its natural gas and power business by falsely inflating its gas trading volume and revenues with round-trip trades. Plaintiffs allege that on November 15, 2001, Dynegy entered into two round-trip trades of electricity with CMS Energy Corporation ("CMS") on Dynegydirect. (SEAC ¶ 94) Plaintiffs allege that the round-trip trades in which Dynegy simultaneously bought and sold power at the same price, terms, and volume, resulted in neither profit nor loss to either transacting party, but instead involved the simultaneous purchase and sale of electricity. Plaintiffs allege that in its fourth-quarter 2001 earnings release DI reported $13 billion in trading value of which $1.7 billion was attributable to the two round-trip trades. Plaintiffs allege that in its first-quarter 2002 earnings release DI reported 89.7 million MWH hours of electric-

ity traded of which approximately 5 million MWH hours were the product of round-trip trades. In that same press release DI improperly reported $236 million in revenue from the round-trip trades. (SEAC ¶ 95) Plaintiffs allege that when in April of 2002 the market questioned Dynegy and its officers about the round-trip trades, Bergstrom falsely attributed the trades to stress testing. (SEAC ¶¶ 96–98)

## B. Lead Plaintiff's Satisfaction of Rule 23(a) Requirements

Defendants contest Lead Plaintiff's failure to satisfy Rule 23(a)'s typicality and adequacy requirements, but they do not contest Lead Plaintiff's satisfaction of the numerosity and commonality requirements. Because the court is bound to conduct its own thorough Rule 23(a) inquiry, *Vizena*, 360 F.3d at 503, the court will address each of Rule 23(a)'s requirements.[69]

### 1. *Numerosity*

Lead Plaintiff argues that

[t]he exact number of class members is presently unknown and can be ascertained only through discovery. But based on the Company's reported shares, notes outstanding, and trading volume during the proposed class period[ ]—Lead Plaintiff estimates that there are thousands of putative class members nationwide.[70]

Lead Plaintiff asserts that during the proposed class period, Dynegy was a Fortune 500 company whose stock traded on the New York Stock Exchange. Plaintiff also asserts

that the "average trading volume for Dynegy stock exceeded one million shares per day during the proposed class period, and that fifteen equity analysts followed Dynegy stock." [71] Based on these undisputed facts, the court concludes that joinder of all class members is impracticable. *See Greenwald*, 102 F.R.D. at 68 (finding Rule 23(a)(1)'s numerosity requirement satisfied where investors traded millions of shares during the class period). The court also concludes that the probable geographic diversity represented among potential § 10b plaintiffs weighs heavily in favor of class treatment. *See, e.g., Mertz*, 497 F.Supp. at 1138 (stating "the geographic diversity of the proposed class greatly reduces the importance of determining the class certification issue on the basis of sheer numbers").

### 2. *Commonality*

The only 1934 Act claims remaining in this case are claims arising from allegedly false and misleading statements and omissions of material fact regarding Project Alpha and the round-trip trades with CMS.[72] Lead Plaintiff argues that questions of law and fact common to all members of the 1934 Act Class include: (1) whether the 1934 Act was violated by defendants' conduct; (2) whether defendants in Project Alpha and the CMS Roundtrip Trades implemented manipulative devices or engaged in the wrongful scheme alleged; (3) whether defendants' statements about Dynegy's financial condition omitted material facts necessary to make the statements made, in light of the circumstances

---

**69.** Although class certification must be addressed on a claim-by-claim basis, *James*, 254 F.3d at 563 (citing *Steel*, 118 S.Ct. at 1018), the parties' arguments as to satisfaction of Rule 23's requirements do not differentiate between Lead Plaintiff's § 10(b), Rule 10b–5, and § 20(a) claims. This is not surprising since the claims alleged under § 10(b) and Rule 10b–5 are essentially the same, and since § 20(a) control-person liability is predicated on § 10(b) liability. *See Kapps*, 379 F.3d at 221 (To state a claim for control-person liability a plaintiff must allege that a primary violation was committed and that the defendant directly or indirectly controlled the violator.). Therefore, the court's Rule 23(a) analysis focuses on the 1934 Act claims instead of the claims asserted under each individual section of the statute.

**70.** Lead Plaintiff's Motion for Class Certification for the 1933 and 1934 Act Claims, Docket Entry No. 413, pp. 8–9.

**71.** Lead Plaintiff's Reply in Support of Motion for Class Certification, Docket Entry No. 441, p. 4 & n. 7 (citing Bloomberg chart of Dynegy Inc. trading volume, Exhibit 25, Excerpts from Nelson's Director of Investment Research 2000, Exhibit No. 26, and Bloomberg description of Dynegy Inc. Class A Common Stock, Exhibit No. 27, included in Appendix in Support of Lead Plaintiff's Reply in Support of Motion for Class Certification, Docket Entry No. 443).

**72.** See Memorandum and Order of October 7, 2004, Docket Entry No. 399, pp. 239 and 241.

under which they were made, not misleading; (4) whether defendants misrepresented material facts; (5) whether defendants knew or recklessly disregarded that their statements were false and misleading; (6) whether the prices of the Company's publicly traded securities were artificially inflated by Project Alpha and the CMS Roundtrip Trades; and (7) the extent of damage sustained by class members and the appropriate measure of damages.[73] The court agrees.

Lead Plaintiff's allegations regarding the existence, nature, significance, and uniformity of the fraudulent scheme perpetrated by defendants via Project Alpha and the round-trip trades with CMS and via material misrepresentations and omissions in public statements regarding these transactions constitute issues common to all class members.[74] Because Lead Plaintiff and the absent class members are bound by their common interest of determining whether defendants' conduct was actionable, Lead Plaintiff's allegations raise issues of fact and law that are not unique but, instead, common to all members of the putative 1934 Act Class. Accordingly, the court concludes that the common questions of law and fact concerning false statements and/or omissions of material fact regarding Project Alpha and the round-trip trades with CMS satisfy the commonality requirement of Rule 23(a)(2).

### 3. Typicality

 Lead Plaintiff argues that it stands in the same position as other potential class members because it purchased DI common stock during the class period at artificially inflated prices and was injured by defendants' common scheme and course of conduct evidenced by the use of fraudulent transactions to artificially inflate the market price for DI's publicly traded securities.[75] Lead Plaintiff also argues that Rule 23(a)(3)'s typicality requirement is satisfied because all putative members of the 1934 Act Class invested in DI securities.[76] *See Rubenstein v.*

*Collins,* 162 F.R.D. 534, 538 (S.D.Tex.1995) (proposed class representatives' claims are typical because they invested in the company just as the potential class members did).

Defendants argue that unique defenses regarding reliance arising from Lead Plaintiff's purchases of DI stock in May of 2002, intra-class conflicts arising from Lead Plaintiff's sale of all of its DI stock before the close of the class period, and inter-class conflicts arising from Lead Plaintiff's attempt to serve as the sole representative of both the 1933 Act and the 1934 Act Classes render Lead Plaintiff atypical and inadequate to represent the putative 1934 Act Class.[77] For the reasons explained above in § II.C.3.(a)-(c), the court has already concluded that none of these arguments defeat Lead Plaintiff's assertion that its claims and the remedial theories on which they rely are sufficiently similar to those of the unnamed class members to satisfy Rule 23(a)(3)'s typicality requirement. *See Lightbourn v. County of El Paso, Tex.,* 118 F.3d 421, 426 (5th Cir.1997), *cert. denied,* 522 U.S. 1052, 118 S.Ct. 700, 139 L.Ed.2d 643 (1998) ("[t]ypicality focuses on the similarity between the named plaintiffs' legal and remedial theories and the ... theories of those whom they purport to represent").

The only 1934 Act claims remaining in this case arise from allegedly false and misleading statements and omissions related to Project Alpha and Dynegy's round-trip trades with CMS that occurred in November of 2001. Lead Plaintiff alleges that defendants misstated and concealed information that would have allowed plaintiffs to discover the truth about these transactions, i.e., that Project Alpha was not an equity investment as portrayed by DI but a financing, and that the trades with CMS were not economic transactions intended to yield profit or loss to either party, but instead the simultaneous purchase and sale of electricity purposely intended to yield neither profit nor loss to either party. Because the claims asserted by Lead Plain-

---

**73.** Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 413, pp. 9–10.

**74.** *Id.* at p. 11.

**75.** *Id.* at p. 12.

**76.** *Id.*

**77.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, pp. 5–14.

tiff arising from these two transactions (Project Alpha and the round-trip trades with CMS) rest on the same facts and the same remedial theories as the claims of the absent class members, because any injury suffered by Lead Plaintiff as a result of materially false and misleading statements about these two transactions will be the same as the injuries suffered by other class members who purchased DI stock following the release of statements about these two transactions to the market, and because Lead Plaintiff's 1934 Act claims are not based on conduct that is unique to it but, instead, based on conduct that would have injured all members of the putative class, the court concludes that Lead Plaintiff's 1934 Act claims for materially false statements and omissions regarding Project Alpha and the round-trip trades with CMS satisfy the typicality requirement of Rule 23 because they arise from the same events and course of conduct that give rise to the claims of the absent class members. *See Stirman*, 280 F.3d at 562 (typicality requirement of Rule 23(a)(3) is satisfied where Lead Plaintiff's claims arise from the same event or course of conduct that give rise to claims of other class members and the claims are based on the same legal theory). *See also Lightbourn*, 118 F.3d at 426.

### 4. *Adequacy*

Citing *Berger*, 257 F.3d at 483, defendants argue that Lead Plaintiff has failed to show that the case is "managed by active, able class representatives who are informed and can demonstrate they are directing the litigation."[78] For the reasons explained above in § II.C.4, the court has already concluded that Lead Plaintiff has demonstrated the adequacy of its representation and the adequacy of its chosen counsel to represent the class.

### 5. *Conclusion*

For the reasons explained above the court concludes that Lead Plaintiff has satisfied Rule 23(a)'s requirements with respect to the 1934 Act claims.

### C. Lead Plaintiff's Satisfaction of Rule 23(b) Requirements

Lead Plaintiff argues that the 1934 Act claims satisfy the requirements of Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of the controversy.[79]

### 1. *Predominance of Common Issues*

Citing *Durrett*, 150 F.R.D. at 560, Lead Plaintiff argues that common issues predominate because the class members were subjected to the same alleged misrepresentations and omissions, which fit within a common course of conduct.[80] Citing *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), Lead Plaintiff argues that there is no issue regarding individual reliance because plaintiffs avail themselves of the fraud-on-the-market presumption.[81] Asserting that Dynegy's securities traded on the New York Stock Exchange throughout the proposed class period and that publicly available information about Dynegy was quickly incorporated into the price for its securities, Lead Plaintiff argues that Dynegy's securities all traded in an efficient market.[82]

"A fraud-on-the-market is any deceit that successfully disseminates false or misleading information into the securities market or withholds vital information from that market." *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1120 (5th Cir.1988), *vacated on*

---

**78.** Opposition to Lead Plaintiff's Motion for Class Certification, Docket Entry No. 431, p. 2.

**79.** Lead Plaintiff's Motion for Class Certification for the 1933 and 1934 Act Claims, Docket Entry No. 413, p. 16.

**80.** *Id.*

**81.** *Id.* & n. 2.

**82.** *Id.* at p. 17. See also Lead Plaintiff's Reply in Support of Motion for Class Certification, Docket Entry No. 441, p. 4 & n. 7 (noting that defendants do not contest DI securities traded on an efficient market).

*other grounds sub nom, Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). The theory holds that such a deceit defrauds investors even when they are unaware of misrepresentations or omissions because investors depend upon the integrity of the market price. *Id.* The fraud-on-the-market presumption only applies if the market for the security is open and developed enough to quickly incorporate material information into the price of the security—in other words, the market is an "efficient" one. *See, e.g., Freeman v. Laventhol & Horwath,* 915 F.2d 193, 197 (6th Cir.1990) ("The fraud on the market theory rests on the assumption that the price of an actively traded security in an open, well-developed, and efficient market reflects all the available information about the value of a company.").

> An open market is one in which anyone, or at least a large number of persons, can buy or sell...
>
> A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available ...
>
> An efficient market is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.

*Cammer v. Bloom,* 711 F.Supp. 1264, 1276 n. 17 (D.N.J.1989) (quoting Bromberg & Lowenfels, and Securities Fraud and Commodities Fraud, § 8.6 (Aug.1988)).

The record contains several strong indications that the market in which DI stock traded was efficient: (1) DI stock traded on the New York Stock Exchange; (2) DI stock traded actively at volumes over 1,000,000 shares a day throughout the class period; and (3) DI stock was the subject of numerous analyst reports and extensive media coverage. The court concludes that these three facts are sufficient to meet plaintiffs' Rule 23 burden to show that the stocks in question traded on an efficient market. Because the court concludes that Lead Plaintiff and members of the 1934 Act Class are entitled to rely on the fraud-on-the-market theory to show reliance, the court concludes that Rule 23(b)(3)'s predominance requirement is met since common questions of law and fact predominate over any questions affecting only individual members of the 1934 Act Class.

#### 2. *Superiority of Class Treatment*

Lead Plaintiff argues that class action treatment is "a superior method for resolving plaintiffs' claims because it provides the fairest and most efficient adjudication."[83] Lead Plaintiff argues that "[i]n addition to substantial losses by thousands of putative class members, many more Dynegy investors sustained losses not substantial enough to justify independently prosecuting their individual claims. Thus, to deny class certification would be to 'clos[e] the door of justice to all small claimants.'"[84] Lead Plaintiff argues that the class action device provides judicial efficiency by permitting common claims and issues to be tried just once, thus binding all parties.[85] Lead Plaintiff argues that "[t]he number of prospective class members here is too numerous, and the underlying factual and legal issues too similar, to argue reasonably that plaintiffs' claims ought to be heard independent of one another."[86] The court agrees. Because this case is likely to involve a large number of plaintiffs with small claims, the court concludes that "the policy underlying Rule 23 to achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results," *Henry,* 199 F.R.D. at 570, satisfies the requirements of Rule 23(b)(3).

#### D. 1934 Act Class Period

The action for alleged violations of the 1934 Act was originally brought against DI

---

83. *Id.*

84. *Id.* at pp. 17–18 (citing *Weeks v. Bareco Oil Co.,* 125 F.2d 84, 90 (7th Cir.1941)).

85. *Id.* at p. 18.

86. *Id.*

and others during a proposed class period beginning on January 27, 2000, and ending on July 22, 2002. (SEAC ¶ 1) The only proposed class representative for the 1934 Act claims remaining in this case is Lead Plaintiff. Lead Plaintiff's certification states that it last purchased shares of DI stock on May 6 and May 7, 2002, and that it last sold shares of DI stock on June 28, 2002.[87] In the pending motion for class certification Lead Plaintiff argues that the class period for the 1934 Act claims should be shortened to the period beginning on April 2, 2001, and ending on July 22, 2002. Defendants argue that the 1934 Act class period should begin on July 24, 2001, and should end on April 25, 2002, or in the alternative, on May 15, 2002.

### 1. *Beginning Date*

 Lead Plaintiff acknowledges that the first *official* Company announcement that arguably involved Project Alpha's effect on Dynegy's financial statements came on 7/24/01—a press release, "Dynegy Posts Record Earnings for Second Quarter"— and that was followed by the Company's 10–Q for second-quarter 2001, on 8/14/01, which reported, for the six months ended 6/30/01, cash flow from operations of $365 million, which Lead Plaintiff alleges was a line item inflated by Project Alpha.[88] Although defendants argue that the 1934 Act class period should begin on July 24, 2001,[89] Lead Plaintiff argues that the class period for the 1934 Act claims should begin on April 2, 2001, because on that date Dynegy

pre-announced purported record first-quarter 2001 earnings and projected full-year 2001 EPS, which it attributed to several "key drivers," including its "merchant leverage effect" in power and gas marketing. SEAC ¶ 195. By the time Project Alpha closed on 4/10/01, The Regents had purchased Dynegy stock three times in

that month. *See* The Regents Amended Certification, Schedule A (purchased on 4/3, 5, 6/01). The first quarter good news was reiterated on April 17, 2001, in a press release that trumpeted "a 73 percent increase [in] ... recurring net income" "while effectively managing volatility in both natural gas and power markets." SEAC ¶ 197. These announcements were followed on 6/21/01, with a press release that cited the purported increased cash flow as the basis for a large stock repurchase: "Dynegy's earnings and cash flow to date have exceeded expectations." SEAC ¶ 202.[90]

Lead Plaintiff argues that Dynegy's reported second-quarter 2001 results were founded on closing Project Alpha with its $300 million windfall in falsely reported cash flow from operations, and that Project Alpha's financial benefits were the basis for the company's June 21, 2001, press release that cash flow expectations had been exceeded.[91] Lead Plaintiff asserts that "the class period for the 1934 Act claims should begin on 4/2/01—as Olis, Foster, Sharkey, and Doty rushed to close Project Alpha—and no later than 6/21/01." [92]

The court is not persuaded that "the class period for the 1934 Act claims should begin on 4/2/01—as Olis, Foster, Sharkey, and Doty rushed to close Project Alpha" [93] as urged by Lead Plaintiff, because neither Project Alpha nor the round-trip trades with CMS from which the live 1934 Act claims arise had occurred by that date. As acknowledged by Lead Plaintiff, Project Alpha did not close until April 10, 2001, and the CMS round-trip trades did not occur until November of that year. Although Lead Plaintiff argues that "[i]t is nonsensical to suggest the 2001 annual earnings projection by April 2001 did not include the results

---

**87.** See Docket Entry No. 393.

**88.** Lead Plaintiff's Motion for Class Certification for the 1933 and 1934 Act Claims, Docket Entry No. 413, p. 6 (citing SEAC ¶¶ 203 and 206).

**89.** Opposition to Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 431, p. 25.

**90.** Lead Plaintiff's Motion for Class Certification for the 1933 and 1934 Act Claims, Docket Entry No. 413, p. 7.

**91.** *Id.*

**92.** *Id.* at p. 8.

**93.** *Id.*

expected from the long-planned and then recently-closed Project Alpha," [94] Lead Plaintiff presents no evidence to support this supposition. Obviously, the April 2, 2001, press release could not include projections from a transaction that had not closed, and which, from the evidence at the Olis trial, was in doubt until the last minute. Nor has Lead Plaintiff presented any evidence either from the language of the April 17, 2001, press release or from other sources (e.g., through industry analysts' reactions to that press release) that the April 17, 2001, press release included any reference to anticipated benefits from Project Alpha.

The court is persuaded that the class period should begin on June 21, 2001, because Lead Plaintiff alleges that the DI press release published on that day cited increased cash flow as the basis for a large stock repurchase, i.e., " 'Dynegy's earnings and cash flow to date have exceeded expectations.' SEAC ¶ 202." [95] Because Lead Plaintiff alleges that the increased cash flow referenced in this press release was the increased cash flow reportedly generated by Project Alpha, the court is persuaded that Lead Plaintiff's argument that the 1934 Act class period should begin on that date has a rational basis. Accordingly, the court concludes that the 1934 Act class period should begin on June 21, 2001. *See In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 378 (S.D.N.Y.2000) ("It does not defeat typicality or adequacy if it appears that the Class Representative did not purchase the stock at the beginning of the period sought to be litigated, so long as the beginning date of the period has a rational basis.").

2. *Ending Date*

■ Lead Plaintiff argues that the class period for 1934 Act claims should extend through July 22, 2002. [96] Lead Plaintiff ar-

gues that ending the class period before July 22, 2002, "would be premature since it ignores ... purchasers of stock who held through the final revelation about Project Alpha." [97] Lead Plaintiff argues that on July 22, 2002,

> Fitch *downgraded* Dynegy's debt based on its "ongoing" analysis and "continued weakening" in the Company's credit profile, stemming from the SEC's investigation of accounting and trading issues and the consequences of Project Alpha and the CMS Roundtrip Trades. Also on 7/22/02, Standard & Poor's cut its long-term-debt rating of Dynegy to *junk* status, citing cash-flow and liquidity concerns. SEAC ¶ 269. The very next day, 7/23/02, the Company issued its "financial update," which revised its 2002 cash-flow-from-operations guidance *down $300 to $400 million*. SEAC ¶ 270. [98]

Lead Plaintiff argues that

> for the 24 days between [its] last sale ... and the Company's bombshell that it had reduced cash-flow-from-operations guidance as much as $400 million, the market was still not aware of the severity of Dynegy's problems nor the extent of its financial manipulations. As a result, the stock price was still above $6 per share. Following the 7/23/02 "update," the stock price dropped from $3.38 to as low as $0.84 per share, before closing at $1.23 per share—*a 60% drop in one day*. SEAC ¶¶ 268, 271. [99]

Defendants argue that the class period should end on April 25, 2002, the date DI announced its $300 million reclassification of Project Alpha cash flows. [100] Defendants argue that an April 25, 2002, cut-off is consistent both with Lead Plaintiff's allegation that "in late April, the Company began to disclose that its financial statements were false

---

94. Lead Plaintiff's Reply in Support of Motion for Class Certification, Docket Entry No. 441, p. 20.

95. Lead Plaintiff's Motion for Class Certification for the 1933 and 1934 Act Claims, Docket Entry No. 413, p. 7.

96. *Id.* at pp. 4–6.

97. *Id.* at p. 4.

98. *Id.* at p. 5.

99. *Id.*

100. Opposition to Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims, Docket Entry No. 431, pp. 25–26.

...,"[101] and with testimony given at the Olis trial by Lead Plaintiff's former investment manager who identified this announcement as the purported catalyst for Lead Plaintiff's divestiture of its shares.[102] Defendants also argue that, consistent with this testimony, purchases made after April 25, 2002, should fail as a matter of law because the corrective statements issued on that day were sufficient to dissolve the fraud-on-the-market presumption created by DI's previous misstatements.[103]

"[T]he class period ends when the full truth has been disclosed to the market and the natural market forces have had a reasonable period of time to receive, digest and reflect the bad news in the market price of the security." In re Oxford, 191 F.R.D. at 378. For the reasons explained in the Memorandum and Order of October 7, 2004 (Docket Entry No. 399), at pp. 75–82, rejecting defendants' arguments that DI's announcements of April 25, 2002, triggered the statute of limitations for the 1933 Act claims, the court is not persuaded that the 1934 Act class period should end on April 25, 2002.

Defendants argue alternatively that the 1934 Act class period should end on May 15, 2002, the date identified in the Memorandum and Order of October 7, 2004 (Docket Entry No. 399), at p. 88, as the inquiry notice date for 1933 Act claims arising from Project Alpha.[104] On that date DI filed its first-quarter 2002 Form 10–Q with the SEC. This filing revealed in undisputable fashion that cash flow from Project Alpha was cash flow from financing instead of cash flow from operations as originally presented, that the revenue for 2001 was $300 million less than originally reported, that the Companies' 2001 financial statements would be restated, that the auditor's report for 2001 was unreliable, and that Project Alpha would be subject to a formal investigation by the SEC.[105] Although the court is persuaded that May 15, 2002, is the day on which corrective disclosures sufficient to trigger the statute of limitations for

the 1933 Act claims arising from Project Alpha were made, the court is not persuaded that the class period for the 1934 Act claims should end on that date for two reasons. First, the May 15, 2002, disclosures did not include corrective disclosures about the round-trip trades with CMS. Second, to end the class period on the day that corrective disclosures were filed with the SEC would close the class period before natural market forces had a reasonable time to receive, digest, and reflect the bad news in the market price of the security. See In re Oxford, 191 F.R.D. at 378 (class period ends when the full truth has been disclosed to the market and the natural market forces have had a reasonable time to receive, digest, and reflect the bad news in the market price of the security). Because the precise day on which natural market forces had a reasonable time to digest and reflect the bad news in the market price is, necessarily, a question of fact, and because the court is persuaded that the July 22, 2002, ending date sought by Lead Plaintiff has evidentiary support, the court concludes that the 1934 Act class period should end on July 22, 2002, as argued by Lead Plaintiff, instead of April 25 or May 15, 2002, as argued by defendants. See In re Ribozyme Pharmaceuticals, Inc. Securities Litigation, 205 F.R.D. 572, 579–580 (D.Colo. 2001) (when substantial question of fact exists, then a broader time period will be certified).

### IV. Conclusions and Order

The court **CERTIFIES** Lead Plaintiff's 1933 Act class to the extent that it includes investors who acquired shares on the offering date of December 20, 2001, but **DEFERS** ruling on the closing date for the 1933 Act class period pending the completion of supplemental briefing on this issue. Accordingly, the 1933 Act Class consists of all persons seeking relief for alleged violations of §§ 11 and 15 of the Securities Act of 1933 (1933 Act), 15 U.S.C. §§ 77k and 77o, during a proposed class period beginning on Decem-

---

101. Id. at p. 26 & n. 39, citing SAC ¶ 3.

102. Id.

103. Id. & n. 40.

104. Id. at p. 27.

105. See Memorandum and Order of October 7, 2004, Docket Entry No. 399, pp. 84–88.

ber 20, 2001, and ending on a date yet to be determined. Lead Plaintiff will be granted thirty (30) days in which to submit a supplemental brief and supporting evidence on this issue, defendants will be granted fifteen (15) days thereafter to file a response, and Lead Plaintiff will be granted fifteen (15) days after defendants file their response to file a reply brief. None of these filings may exceed ten (10) pages.

The court **CERTIFIES** Lead Plaintiff's 1934 Act class for the period beginning on June 21, 2001, and ending on July 22, 2002. Accordingly, the 1934 Act Class consists of all persons seeking relief for alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, during a proposed class period beginning on June 21, 2001, and ending on July 22, 2002.

Lead Plaintiff's Motion for Class Certification for the 1933 Act and 1934 Act Claims (Docket Entry No. 413) is **GRANTED in part** and **DEFERRED in part**.